# CHARLESTON.

STATE v. DANIEL WOLFE

(No. 5430)

Submitted September 22, 1925. Decided September 29, 1925.

1. CRIMINAL ' LAW—WITNESSES—*Extent to Which Prosecuting Witness May be Cross-Examined to Show Fixed Bias Towards Accused is Left Largely to Sound Discretion of Trial Court; Trial Court's Action in Excluding or Permitting Questions on Cross-Examination is Not Reviewable Except in Cases of Manifest Abuse or Injustice.*

   On trial of a person charged with crime, the extent to which a prosecuting witness may be cross-examined to show a fixed bias toward the defendant is left largely to the sound discretion of the trial court. In the exercise of this discretion in excluding or permitting questions on cross-examination, its action is not reviewable on appeal, except in cases of manifest abuse or injustice. (p. 700).
   (Criminal Law, 17 C. J. § 3584; Witnesses, 40 Cyc. pp. 2512, 2513, 2659).

2. SAME—*Remarks of Counsel Will Justify New Trial Only When Wholly Unwarranted by Evidence and Prejudicial.*

   It is only where the remarks of counsel are wholly unwarranted by the evidence and prejudicial to the party affected, that they will justify a new trial. (p. 700).
   (Criminal Law, 16 C. J. §§ 2240, 2641).

3. SAME—HOMICIDE—*Province of Jury to Weigh Evidence on Self Defense; Jury's Verdict, Adverse to Accused, Will Not Be Set Aside Unless Manifestly Against Weight of Evidence.*

   It is peculiarly within the province of the jury to weigh the evidence upon the question of self defense, and the verdict of a jury adverse to that defense will not be set aside unless it is manifestly against the weight of the evidence. (p. 701).
   (Criminal Law, 16 C. J. § 2290; 17 C. J. § 3593: Homicide, 30 C. J. § 580).

4. HOMICIDE—*Evidence Held to Sustain Verdict of Murder in Second Degree.*

   A case where the evidence sustains a verdict of murder in the second degree. (p. 696).
   (Homicide, 30 C. J. § 560).

NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.

Error to Circuit Court, Harrison County.

Daniel Wolfe was convicted of second degree murder, and he brings error.

*Judgment affirmed.*

*Robinson & Robinson* and *John S. Stump, Jr.,* for plaintiffs in error.

*Howard B. Lee,* Attorney General, and *R. A. Blessing,* Assistant Attorney General, for the State.

WOODS, JUDGE:

From a judgment of fifteen years' imprisonment in the penitentiary, upon a verdict of a jury for second degree murder, Daniel Wolfe appeals to this Court.

To get a proper perspective of the case, the following facts preliminary to the summarization of the testimony are pertinent: The defendant, age 37 years, is a glass worker by trade, and has a wife and four children. Becoming estranged from his wife, some seven months prior to the time of the homicide, he left his family at their home in Clarksburg, he having ever since that time been employed at his trade in Ohio and Pennsylvania. On the trial it developed that the husband attributed this estrangement to attentions given to his wife by his brother, Albert Wolfe. The said brother, however, disclaimed any motive in such attentions other than a natural friendly interest in the neglected wife and children of a brother. Aside from the diametrically opposed statements of the two brothers, as to the reason for such estrangement, the record is silent.

The evidence disclosed by the witnesses for the State is to the effect that on the night of July 12, 1924, the defendant came to the house where his family had been living since he left them several months before, in the Northview Section of the City of Clarksburg. When the defendant approached the rear of the house, his wife, three children and his brother Albert, were in the kitchen. According to the testimony of

Albert Wolfe, as the defendant approached the kitchen the defendant's wife said, "There.is Dan," and grabbed the children and rushed to the bath room; that the defendant came thru the door with a pistol in his hand and said, "I have come back to get you, I am going to kill you," directing his remarks to the witness; that defendant told witness to go into the dining room, which he did, and defendant searched him to see if he had any weapons on him; that defendant then went on to the bathroom door and tried to get in, but the door was locked and that defendant's wife and children were screaming; that when defendant could not get in the bathroom he came back to where witness was and witness tried to reason with him and told him to put the pistol away and be reasonable and fix things up without trouble, and defendant said, "I came for trouble and I expect to have it"; that shortly after defendant came from the bathroom door witness heard one of the little girls, Esther, leave the rear of the house along the board walk, and in a minute or two later he heard screams over about Claude Wilson's place, and shortly thereafter witness heard Wilson coming towards the house, and witness told defendant to put away his gun or he would get in trouble and defendant got up from where he was sitting and passed out through the dining room and out the rear door; that witness made for the front door and while he was unlocking it he heard a shot fired in the rear, and some one scream, "I am shot"; that witness went out of the house to a nearby store; that he saw Mr. Wilson crossing the vacant lot, and later assisted him into a hospital ambulance; and' that witness did not see defendant again until he was arrested by the officers at the home of another brother in a distant section of the city.

Esther Wolfe, age twelve years, a daughter of the defendant, was at home the night of the shooting and at her mother's request went to the home of Claude Wilson for assistance. She testified that when the defendant came to the house her mother said, "My God, it's Dan," and ran into the bathroom, witness followed her and her mother locked the door; that the defendant came to the door and said, "If you don't let me in I am going to kill you," and that witness

got out of the window and went to Claude Wilson's home and asked Mr. Wilson for help; that Mr. Wilson went to the defendant's home, but witness did not accompany him, but later heard a shot; that the shot occurred about five minutes after Wilson left his home. Witness further testified that when Mr. Wilson started for defendant's home he got a hoe from under his porch and took it with him.

Further testimony introduced by the State disclosed that the defendant went to the home of his brother, Adolphus Wolfe, at Glenwood Addition; that his sister-in-law on coming home from a show at eleven o'clock found him there; that on being told that he had been over at his home, the witness inquired, "There was no trouble over there was there?" to which the defendant replied, "No, I did not go for trouble Daisy"; that witness further asked had he done any harm, and defendant said, "No, he had done no harm to nobody"; that as they were preparing for bed the officers came and arrested him. Sometime after his arrest he further told this sister-in-law that he had tried to reason with his wife, but that she ran into the bathroom and shut the door and "hallooed bloody fire"; that he asked her to come out, assuring her he was not going to hurt her; that about that time this man (Wilson) came and was going to kill him, and he "shot once straight up into the air to scare him". Seymour Edwards, one of the officers who assisted in making the arrest, testified that when they went to the home of Adolphus Wolfe, they found the defendant behind the door in a room; that he denied to the officers that he had a pistol and that he had shot deceased; and that later he said he had thrown the pistol in the river, where it was found by the officers.

Dr. B. F. Matheny, County Coroner, testified concerning the character of the wound that caused the death of the deceased, and on cross-examination testified that he probed the wound for the bullet and the wound would open better if the deceased's hands were raised and that such would indicate that deceased's left arm was raised at the time he was shot.

John Kroll, a neighbor, testified that he saw Esther Wolfe running to the Wilson house crying, "Come on and help, my mother says that father came to kill us"; that thereupon

Wilson came over to witness' house and asked witness to go with him to the Wolfe home, "to help save life"; that after talking a few minutes Wilson left the witness' home and went straight to his front porch and later he saw a shadow going in the direction of the Wolfe house and later witness heard a shot at the Wolfe house.

The defendant in his own defense testified that he came from Point Marion to his home on the evening of the shooting, arriving there about 8:45 o'clock; that he went there for the purpose of persuading his wife to move to Point Marion; that he found his brother, Albert, in the kitchen, who told him not to come into the house; that he did not see his wife but supposed she was in the bathroom; that he did not say anything before he got to the kitchen door and then he told his brother that he had come to see his children; that defendant had a box which contained two fountain pens, two sets of beads and a pair of shoes which he had brought home for his children; that his brother, Albert, stood in the room in an attitude as though he was going to draw a gun and the defendant told him that he had not come there for any trouble, but was there for the purpose of seeing his family, and believing that his brother, Albert, might shoot him, defendant said he "jerked a gun" from his pocket and "throwed it on him (Albert) and searched him," but did not find any weapon on him, and further told his brother to go into the dining room and sit down, which he did; that the defendant then went to the bathroom door and tried to open it and found it was locked and told his wife to come out that he wanted to see the children, but that he did not state that if she did not come out or did not let him in he would kill her, but that the children did scream and halloo while in the bathroom. The defendant then proceeded to talk to his brother, Albert, about his visits to the defendant's home and told him that he ought not to be there, that people were talking about it; that defendant was in the house all told about fifteen minutes, during which time defendant did not threaten to shoot his brother or his wife; that later, because the children were screaming and hallooing, defendant thought it best to leave and when he went outside and down off the porch Mr.

Wilson came at him with a hoe and struck at him two or three times saying that he was going to chop defendant's damned head off, and that defendant was cornered and fired the shot in self defense. Defendant had never seen the deceased before, but thought he was a neighbor, a Mr. Johnson, and defendant said to him, "Mr. Johnson don't hit me with the hoe I have not come here for any trouble"; that defendant had never had any trouble with Mr. Johnson, or with Claude Wilson, and fired the shot because he thought the deceased was assaulting him to inflict upon him great bodily injury, or to take his life and that the shooting was done to protect his life and prevent the infliction of great bodily injury upon him; that after the shooting occurred the defendant went to the home of his brother, Adolphus Wolfe, who lived a distance of something like one mile away, where he was arrested by the officers.

The defendant rests his appeal upon three rulings of the trial court, each of which he alleges to be error. The first issue was raised by the objection of the State to questions asked Albert Wolfe on cross-examination by defendant's counsel relating to requests made by witness' father and mother and mother-in-law to the effect that witness quit paying visits to the defendant's home, which objection was by the court sustained and decided against the defendant. 2 Wigmore Ev. 981 is cited to sustain the position of the defendant. Mr. Wigmore there lays down the rule "that facts of misconduct from the witness upon cross examination may be elicited; for the reason (a) There is no confusion of issues, because the matter stops with the question and answer; (b) There is no danger of unfair surprise, because the impeached witness is not obliged to be ready with other witnesses to answer extrinsic testimony of the opponent, for there is none to be answered, and because, so far as the witness himself is concerned, he may not unfairly be expected to be ready to know and answer as to his own misdeeds." It will be observed that the foregoing rule has no application here. Counsel for defendant in their brief contend that such cross examination would have tended to disclose the witness' bias and prejudice against the defendant and his personal interest in

the prosecution; that the said witness, tried to convey to the jury the impression that the defendant was his favorite brother and that he, the witness had no ill feeling against the defendant, or motive to swear falsely against him. It is apparent that any proper cross examination for this purpose would be permissible. Mr. Wigmore says: ''The range of external circumstances from which probable bias and interest may be inferred is infinite. Accurate concrete rules are almost impossible to formulate.'' Expressions and conduct are the commonest means of showing bias. The court in the instant case permitted the prosecuting witness to be cross-examined fully along this line. Aside from such cross-examination no attempt was made to show by any witness other than defendant any expression or conduct of the witness that would indicate bias against his accused brother. Suppose the father, mother, and mother-in-law had told Albert Wolfe not to go to the home of his brother? Such admonition, if given, would have been only based on their opinion of the propriety of the act and not competent. In this sort of evidence the only question is whether from the conduct or language a palpable and more or less fixed bias to the party is inferable. According to the decided weight of the authorities such questions should be left largely to the discretion of the trial court. In the exercise of this discretion it may exclude or permit such cross examination, and its action is not reviewable, except in cases of manifest abuse or injustice. *State* v. *Porter*, 98 W. Va. 390; *State* v. *Prater,* 52 W. Va. 132; 2 Wigmore on Ev. (2nd Ed.) Sec. 950; Jones on Ev., Sec. 830. As we view it, such evidence offered here, if proper, and admitted, would be a two-edged sword so far as the defendant's case is concerned. If it revealed a motive for the witness to swear falsely against his brother, would it not likewise go to establish the hostile state of mind of the defendant toward his brother on the night of the homicide? So, we are of the opinion that the ruling of the court complained of was not prejudicial to the rights of the defendant.

The next assignment of error is based upon the refusal of the trial court to sustain the objection of counsel for the

defendant to a statement made in argument to the jury by the prosecuting attorney. The language complained of is as follows: "The defendant came there armed with a revolver, with murder and malice in his heart, ready to kill any who might try to oppose him." The evidence adduced on behalf of the State shows that the defendant went into the house that night with a loaded pistol in his hand. He said to his brother, "I have come back to get you, I am going to kill you." According to his own little daughter he said to his wife, who had taken refuge in the bathroom, "If you don't let me in I will kill you." He further stated to his brother, "I came for trouble and expect to have it." Swiftly on the heels of these statements, he shot to death a fellowman—his neighbor. Counsel necessarily has wide latitude in the argument of a case, and it is of course within the discretion of the Court to restrain him. It is only when remarks of counsel are unjustified by the evidence, and prejudicial, that they will be grounds for a new trial. *State* v. *Scurlock,* 99 W. Va. 629, 130 S. E. 263; *State* v. *Taylor,* 57 W. Va. 228; *State* v. *Shores,* 31 W. Va. 493. Were the remarks of the attorney for the State unjustified by the evidence? We cannot say so.

The last ground relied on for reversal is that the evidence did not warrant the verdict. The defendant sought to justify his act in killing Wilson upon the ground that it was done in necessary self defense. The case was tried throughout, and evidence was admitted and the instructions of the court framed on that theory. There can be no doubt that the defendant by his acts produced the occasion that resulted in the death of an innocent well-intentioned man. Mr. Wharton says: "If the defendant in any way challenged the fight, and went to it armed, he cannot afterward maintain that in taking the assailant's life he acted in self defense." 1 Wharton Crim. Law (9th Ed.) Sec. 485. He is precluded by his conduct to avail himself of a necessity arising from a present impending peril of great bodily harm brought on by his own wrongful act. The evidence shows that the deceased went to the home where he lost his life with no other purpose

than to prevent a felony, which he believed, from the statement of the defendant's twelve year old daughter, was about to be committed. He was shot to death while on this lawful mission by the defendant. The defendant was the only witness to the shooting. He went before a jury of his country on the plea that his act was justified. On this issue the jury found against him. Upon a careful review of the entire record we are constrained to view their finding as eminently just.

*Judgment affirmed.*