# CHARLESTON.

ERMA NEES *v.* JULIAN GOLDMAN STORES, *Inc.*

(No. 6793)

Submitted September 3, 1930. Decided September 9, 1930.

330

*Wm. Bruce Hoff* and *Thayer McIntire,* for defendant in error.

*Russell, Hiteshew & Adams,* for plaintiff in error.

LIVELY, PRESIDENT:

Mrs. Erma Nees, plaintiff below, was awarded a judgment on a verdict of $7,500.00 by a jury for an assault and injuries resulting therefrom committed by Harry Millman, manager of the Julian Goldman Stores, Inc., defendant below, which prosecutes this writ of error, charging (1) that the verdict is contrary to the law and the evidence; (2) that the court erred in allowing certain evidence offered on behalf of defendant.

The gravamen of the complaint is fully set out in a prior decision. *Nees* v. *Julian Goldman Stores, Inc.,* 106 W. Va. 502. The testimony of Mrs. Nees, corroborated by her sister-in-law, Mrs. Flowers, an eye witness, substantially supports the allegations.

Evelyn Anderson, a domestic servant in the home of the plaintiff, had purchased a hat and a coat from the defendant and had executed a conditional sales contract therefor, which provided that in the event of failure of payment for the merchandise, defendant had the right to re-take possession of the articles purchased, either with or without process of law wherever the merchandise might be. According to Mrs. Nees, on the morning of April 13, 1927, at which time she had been pregnant for a period of four and one-half months, Evelyn Anderson entered her room in the second story of the house and took from the clothes cupboard the coat which she had purchased from defendant. Plaintiff's attention was then attracted by loud talking in the downstairs portion of her house. Investigating, she found Millman, whom she recognized as the person who had, on the previous day, called to collect from Evelyn Anderson on her account due defendant, standing in the doorway between the living room and the hall. Plaintiff advised Millman of her physical condition, then apparent, told him that she wished no disturbances in her house because of her condition, and requested him to leave. About twenty minutes later, when plaintiff came downstairs, she found Millman still in the living room and again ordered him to leave. Millman demanded the money owed him by Evelyn Anderson, used abusive language, shook his fist at plaintiff, and accused her of upholding her domestic servant. When ordered a third time to leave, Millman started toward the door; but having reached the kitchen door, which had been partially closed by plaintiff who had followed Millman thereto, he suddenly turned, forced the door open, thus pushing the door knob violently into plaintiff's side, struck the body of plaintiff with his fist or arm, causing her to fall over a small chair and then to the floor, announced, in opprobious terms, that he would have his money or his merchandise, and started after Evelyn Anderson who had been standing in the room with the coat on her arm. Failing to catch the domestic servant, he returned to the kitchen and left the house. Plaintiff then threw the coat, which had been thrown to her, out of the house. Thereafter, plaintiff suffered pains in her abdomen, and on May 14, 1927,

experienced a miscarriage. Doctor S. M. Prunty, who had been attending Mrs. Nees during the pregnancy period, testified that plaintiff's physical condition, when he first called on her, was good, except for the usual pregnancy ailments, and in response to a hypothetical question, based on plaintiff's testimony, replied that he attributed the miscarriage to the shock and injury sustained by plaintiff on April 13, 1927. In 1929, Mrs. Nees again experienced a miscarriage, which, together with injured genital organs, poor health and weakened physical condition, she attributes to the injury. There is, however, a difference of medical opinion as to whether one miscarriage predisposes future miscarriages.

The defense of the Julian Goldman Stores, Inc., is that Millman who had been employed as manager of its Parkersburg store, was acting outside the scope of his employment and authority, since it was the general policy of defendant that managers could not collect for or repossess any merchandise, and that Millman had been so instructed. Harry S. Teahn, road manager for defendant, whose duty it was to install managers and who had installed Millman, testified that he had instructed Millman of these restrictions, although he admitted that Millman had control of all collections. It was further shown that "most of the managers have a contract" and that these contracts contain all the instructions the managers receive, but Stupel, secretary to Julian Goldman, did not know whether or not Millman had executed one of these contracts. Millman, however, had, during his management, instituted a number of suits for the collection of accounts due defendant, and after obtaining the coat when the assault was made, had, later, a writ in detinue issued to recover and did recover from Evelyn Anderson the hat which she had purchased from defendant.

To militate against the evidence adduced by plaintiff, Howes, salesman-collecter for defendant, told a contradictory story. He had called at the Nees home to collect from the vendee and was requested to return about three o'clock on that day. He did so, but it was Evelyn Anderson's afternoon off from work. This he reported to the manager, who, being disappointed,

decided to call on the vendee with the collector. Again Evelyn Anderson was not at home, and they left to return the next morning. A child answered the door and told them that the vendee was not there, but Howes saw her through a crevice in the door, whereupon Millman demanded the money or the coat. Howes heard "the lady running upstairs and crying very loudly", and, according to Howes, it was plaintiff, not Millman, who used the abusive and indecent language and who threw the coat in question out of the house and into the rain. Howes further testified that Millman did not go into the house or strike or push Mrs. Nees.

Evelyn Anderson was not a witness, not having been located, but counsel for plaintiff appear to have been diligent in their search for her. Millman, who had been discharged by defendant, early in 1928, did not testify, and there is no evidential data which indicates any effort on defendant's behalf to have him summoned as a witness.

For convenience, the parties will be designated as plaintiff and defendant as they were in the court below.

The first point of error is that the verdict was contrary to the law and the evidence, and hence the refusal of the court to direct a verdict for defendant was error.

The basis of this point is that Millman, the general manager, who committed the assault resulting in damages to plaintiff, was acting without the scope of his authority, either actual or apparent, in the commission of the assault, and therefore his principal (defendant) was not liable. This point of error involves the instructions given and refused, which relate to the liability of defendant for the acts of Millman, and which instructions will be considered under this point of error so far as they relate to defendant's liability under the law and evidence.

It is contended by defendant Stores Inc., that Millman was not acting within the scope of his authority or duties when he committed the assault. It is pointed out that he had no power or authority, and it was no part of his duties to make collections for merchandise sold, or to repossess the merchandise. On the other hand, it was shown that he had general charge of

the Parkersburg store with power to employ and discharge the employees including the collectors. He was responsible to his employer for the management of the branch store. He occupied the position of a vice-principal in the control of the employees under his general charge. He had general charge of the collections, and had instituted suits for the purpose of making collections or recovering goods sold under conditional sales contracts. Suit for possession of the hat purchased by Miss Anderson was instituted soon after the day of the assault. Being dissatisfied with the fruitless effort of his collector to obtain money for the goods sold on conditional sales contract to Miss Anderson, he went with the collector with the avowed purpose of getting the money or the goods. Had the collector entered the dwelling for this purpose, and in the alleged "strong arm" attempt to get the money or the goods from Miss Anderson had committed the tortious act complained of in the declaration and substantiated by plaintiff's evidence, the defendant would have been liable for the acts of the collector; and it is not perceived why the general manager who had charge of the collections and collectors, and acting with the collector would stand in any different relation to the master. Whether Millman committed the tort, and whether it was committed in the course of and within the scope of his employment were jury questions, and it was proper to submit those issues to the jury under proper instructions. *Nees* v. *Julian Goldman Stores Inc.*, 106 W. Va. 502; *Simmons* v. *Pa. Ry. Co.*, 48 A. 1070. It was not error to refuse defendant's peremptory instruction to find in its favor. By plaintiff's instruction No. 2 the jury was told that a principal is liable for the act of its agent committed in the scope of his employment resulting in damages, and that if they believe from the evidence that Millman was in the employment of defendant and acting as its agent within the scope of his employment as such agent, and committed the assault resulting in damages to plaintiff, as a proximate result, then they should find for plaintiff. By plaintiff's instruction No. 3, the jury was told, in substance, that the act of an agent is within the scope of his employment if it be something fairly and naturally incident to the business for

which the agent was employed and be committed while engaged in the principal's business, or to further the principal's business, and the act does not arise wholly from some external, independent and personal motive on the part of the agent to do the act on his own accord; and if they believed from the evidence that Millman was the agent of defendant and committed the assault, and that the act was fairly and naturally incident to the business then being performed for his principal, and with a view to further the principal's interest, and did not arise wholly from some external, independent and personal motive on the part of Millman and on his own accord, then the act was within the scope of his employment. We perceive no error in thus defining the meaning of the term "scope of employment" of an agent sent forth to do his master's business. 2 Mechem, Agency, sec. 1960; *Davis* v. *Merrill*, 112 S. E. 628. It is quite generally held that where the principal puts the management of his business or property in the hands of his agent, the former is responsible for the acts of the latter committed within the scope of employment, and in furtherance of the principal's business, although the act was committed through lack of discretion or judgment, or loss of temper occasioned by the circumstances of the occasion. If an indiscreet or incompetent agent or one of violent temperament is employed, the principal may become liable. *Nees* v. *Julian Goldman Stores, supra,* and authorities there cited, including *Gregory's Admr.* v. *Ohio. River Rd. Co.,* 37 W. Va. 606, wherein JUDGE BRANNON quotes with approval from Story on Agency, sec. 452, that the principal is "liable to third persons in a civil suit for frauds, deceits, concealments, misrepresentations, torts, negligence, and other misfeasances and omissions of duty of his agent in the course of his employment, although the principal did not authorize, or justify, or participate in, or induce, know of, such misconduct, or even if he forbade them, or disapproved of them. In all such cases the rule applies, *respondeat superior,* and is founded on public policy and convenience; for in no other way could there be any safety to third persons in their dealings, either directly with the principal, or indirectly with him through the instrumentality of

agency." And he adds that "the master is liable for the wrongs and negligence of his servant just as much when it has been done contrary to his orders, and against his intent, as he is when he has cooperated in or known of the wrong."

Defendant's instruction No. 4, refused, designed to define to the jury the phrase, "scope of employment," in the main is quite similar to plaintiff's instruction No. 3, above discussed, for it would have told the jury that the master was liable for the negligence of the servant for those acts of the latter "which are fairly incident to the employment; or, in other words, which the master has set in motion, so that the master is liable for the injuries resulting from the execution of the employment." But the instruction ends with the following paragraph: "Any act directed or authorized by the master is included within the scope of the employment, but the acts of the agent wilfully and intentionally done without the command or authorization of the master are not." There was no error in refusing this instruction, so worded. Nor do we perceive error in plaintiff's instruction No. 4, which told the jury, in substance, that if they believed from the evidence that Millman was the agent of defendant and committed the assault in an effort to carry out the business of defendant intrusted to him and for the purpose of advancing his principal's interests and not for some reason wholly personal to himself, then the act was within the scope of his employment, although they might believe further that the act was indiscreet and improper.

Defendant's instruction No. 5, refused, would have told the jury that before they could find for the plaintiff, they must believe from a preponderance of the evidence that the acts of Millman *pertained* to the service for which he was employed by defendant. We can see no objection to this instruction, but the principle of law embodied in it was given to the jury in defendant's instruction No. 3, wherein they were told that plaintiff could not recover, unless they believed that the acts of Millman complained of were committed by him "then and there acting in the course of and scope of his employment and authority, and in discharge of his duties to said defendant as such agent and manager and in the furtherance of the interests

of the defendant.'' Instructions embodying the same principle of law should not be repeated. For the same reason, defendant's instruction No. 8 was properly refused, for it embodied the same principle of law contained in plaintiff's instruction No. 3, which was given.

Defendant's instruction No. 10, refused, would have told the jury that if they believed that Millman went to plaintiff's house to collect money or recover goods sold to Miss Anderson and that while there for that purpose committed the assault on plaintiff, there could be no recovery unless they further believed that defendant authorized or ratified the assault. This instruction, if given, would have been, practically, an instruction to find for defendant. It leaves out the necessary qualification of the pursuit or furtherance of defendant's business in the commission of the act complained of, and whether the act was within the scope of the employment. To sustain this instruction, *Callahan* v. *Hyland et al.*, 59 Ill. App. Ct. Repts. 347, and cases of like import are relied upon. The facts of that case are essentially different from the case at bar. There the agent had gone to the vendee's home to collect for goods sold on installments, and required payment, which payment had been made in full and receipt therefor previously given. He doubted that payment had been made, and the vendee of the goods called the plaintiff, her landlady, who confirmed full payment for the goods direct to the agent's principal. He then became abusive and the plaintiff requested the vendee to go away and take the agent with her. The vendee left, but the agent remained at the kitchen door and turned upon the plaintiff saying he would take a little money out of her and seized and beat her. Here was an assault upon a stranger for the purpose of taking money from her to pay another person's indebtedness, an act not fairly nor naturally incident to the agent's employment. The court recognized the rule that ''a principal is not liable for the torts of his agent in any matter beyond the scope of his agency, unless he has expressly authorized them, or has subsequently ratified them.'' The trial court took the case from the jury, holding that the facts proven showed that the assault was beyond the scope of the agent's

employment, and the appellate court affirmed. The evidence in the instant case shows that Millman forced his way into plaintiff's dwelling and knocked her out of his way in pursuit of Miss Anderson with the avowed purpose of getting money from her or taking from her the merchandise, the coat which was then in her hands, and pursued her to some other part of the house. As before observed in this opinion, and held in *Nees* v. *Julian Goldman Stores, Inc.*, *supra*, a jury question as to whether Millman was acting within the scope of his employment when he committed the assault was presented, and it would have been error to practically take the case from the jury by giving defendant's instruction No. 10. *Pruitt* v. *Watson*, 103 W. Va. 627, is of the same class as *Callahan* v. *Hyland et al.* In the *Pruitt* case the goods alleged to have been taken by the plaintiff had been recovered by the agent of defendant. The agent then in detaining her until a policeman came, assaulted her. He had recovered the goods and the assualt upon her afterwards was held to be not within the scope of his employment.

Defendant's instruction No. 9 was refused. That instruction reads as follows: "The court instructs the jury that an agent or servant cannot be said to be acting within the scope of his employment if the act complained of, if done by the master, would be unlawful." It will be noted that the instruction is in the abstract. This Court said in Syl. 1 of *Parker* v. *B. & L. Assn.*, 55 W. Va. 134: "An instruction embodying an abstract proposition of law, without in any way connecting it with the evidence or indicating what facts the jury must find from the evidence, in order to make it applicable to the case, ought not to be given; and if the court can see that such an instruction has confused or misled the jury, the judgment resulting from the verdict will be reversed." But irrespective of the abstract nature of this instruction, the principle of law it states was expressly held to be inapplicable to the charges made in the declaration (now sustained by the evidence) in *Nees* v. *Goldman Stores, Inc.*, 106 W. Va. 502, page 506. It was there said by JUDGE MAXWELL that the broad statement of law therein contained should be considered and interpreted in

the light of the circumstances of the case in which it was pronounced *(Pruitt* v. *Watson, supra)*. In the opinion of the writer of this opinion, the third point of syllabus in *Pruitt* v. *Watson,* 103 W. Va. 627, is too broad and general, and is likely to breed confusion.

The main contention of defendant, supported by an able reply brief, is that the instructions offered by plaintiff and given failed to instruct the jury properly as to the measure of damages. Plaintiff's instructions Nos. 2, 5 and 6 deal with the question of damages, in the event the jury found defendant to be liable. Instruction No. 2 ends with "then, you are to find for the plaintiff and assess her damages to such as you may believe her entitled to, under the evidence in this case, not to exceed the sum of $50,000.00, the amount sued for." Instruction No. 5 contains a like direction in these words: "* * * then, you must find for the plaintiff and assess her damages at such sum as you may believe her entitled to, under all the evidence in this case, not exceeding the sum of $50,-000.00, the amount sued for"; and instruction No. 6 says "* * * and you shall assess her damages at such sum as you may believe, from the evidence, that she is entitled to recover, not in excess of $50,000.00, the amount sued for." It would be very difficult, if not quite impossible, to lay down a yard stick, or measure, by which to compensate for pain and suffering, or the impairment of health. Damages are awarded to compensate for injury suffered, and where the loss is of a money nature and admits of definite estimate a "yard stick" for its measurement can be easily, and should be, given. But where the damages do not admit of definite or approximate estimate, there is no legal measure of damages, and the law leaves the amount entirely to the sound discretion of the jury, and the verdict in such case will not be disturbed unless the amount is so large or small as to evince passion, prejudice or some ulterior motive on the part of the jury. *Gibbard* v. *Evans,* 87 W. Va. 650; 4 Ency. Digest Va. and W. Va. Repts. 183. Who shall measure physical pain, mental anguish, or impairment of capacity to enjoy life? Perhaps it would be better to say that the criticism of the instructions is that they do not

tell the jury the elements of the damages to be assessed. The declaration is for $50,000.00 damages caused by tort resulting from physical pain and mental anguish, the grief, humilation, mortification and embarrassment, and by reason of the said miscarriage and the loss of her said child, and the permanent impairment of her health. The evidence of plaintiff in this regard was confined to a detail of the circumstances of the assault, the physical pain and suffering resulting therefrom, the miscarriage, and the impairment of her health in consequence thereof, which she claimed was of a permanent nature. She testified that she was unable to do heavy household work such as washing and heavy sweeping, and was corroborated by others, but there was no attempt to value the loss of her services in the home. Her inability to do heavy household labor was given as evidence of her weakened physical condition and impairment of health. The elements of damages for which she could recover were phyiscal pain, mental anguish, and impairment of her capacity to enjoy life. These instructions do not give these elements of damage. Plaintiff's instruction No. 6, however, tells the jury that in assessing her damages they may "take into consideration the physical pain, mental anguish, grief, humiliation and embarrassment; and the impairment, either temporary or permanent, of her health which she is shown by the evidence to have suffered or sustained, if any." Some of the members of the Court think this instruction sufficiently laid down the elements of damage to the exclusion of any other; and in view of the evidence, the instruction might be interpreted as to limit the jury to those elements. However, conceding that the elements of damage were not given in plaintiff's instructions, does such omission constitute reversible error? In our case of *Taylor* v. *Lumber Co.*, 90 W. Va. 530, 536, the instructions for plaintiffs gave no measure of damages. "The instructions merely told the jury in the event of finding of right of recovery, to award the plaintiffs such damages as they had sustained." In two instructions for plaintiffs and in six instructions for defendant necessity of limitation of the verdict to the evidence was brought to the attention of the jury. The sixth point of the syllabus says: "In-

structions hypothetically submitting to the jury the question of plaintiff's right of recovery and telling them to allow such damages as the plaintiff is entitled to, in the event of a finding in his favor, are not erroneous for failure to define the measure of damages, nor for failure to give the jury conditional directions as to a claim of mitigation of damages in favor of the defendant.'' We are not disposed to overrule this syllabus. The criticism of these instructions is that they failed to tell the jury they *could not* find damages for loss of time, impairment or diminution of future earning power, allowance for medical and hospital expenses, or punitive damages. It may be again observed that there was no evidence of value of loss of time, loss of earning power, medical or hospital bills, and the jury was told to find damages as they might believe *from the evidence* she was entitled to recover. Punitive damages were not claimed either in the declaration or evidence. Generally speaking, the jury should be instructed as to the proper measure of damages, where a measure can be given, and the elements to be considered in awarding them. It is by no means clear that the jury was misled, and went beyond the evidence and gave damages upon some element of damage not before them. We must accord to the jury reasonable intelligence and fairness. 1 Blashfield Inst. to Juries, (2nd Ed.), sec. 171, says: ''A party will not be heard to complain that the instructions as to the measure of damages in a particular case are insufficient in the absence of a request for a further instruction.'' 1 Randall Inst. to Juries, sec. 468, lays down the general rule as follows: ''Where the instructions given are applicable to the evidence, and good as far as they go, and set forth with reasonable fullness the general principles applicable to the case, or to a particular issue, a party desiring further or more specific instructions should request them, and in the absence of such a request he cannot complain of omissions in the charge, unless it plainly appears that the jury was misled by such omission.'' And in section 469, the author points out that the rule is applicable to ''questions relating to the measure and elements of damages'', citing cases from the federal and many state courts. A casual inspection of these cases sustain

the text, notably that of *Buzzell* v. *Emerton*, 161 Mass. 176, 36 N. E. 796; and *Galveston Oil Co.* v. *Malin*, 60 Tex. 645. Our statute, chap. 131, Code, sec. 23, requires all instructions to be read by the court as its action and ruling without reference to or disclosing the party by whom they may have been prayed. We think it the better practice for the plaintiff in cases of this character to offer a complete and full instruction on the measure or elements of damage, and where that has not been done and the instruction is good so far as it goes, the opposing party should ask for an instruction which he conceives to be full and complete. By so doing, we see no risk of admission of liability, as was argued at the bar. Under the holding in *Taylor* v. *Lumber Co., supra,* we find no reversible error in the instructions in this regard.

It is also urged as an element of error in the instructions because the jury is told to find such damages etc. ''not in excess of $50,000.00, the amount sued for''. That objection has heretofore been before this Court, the latest discussion being found in *Looney* v. *Railway Co.,* 102 W. Va. 40, wherein such instructions were held to be not reversible error in point 2 of the syllabus. Counsel for plaintiff has assembled many cases from other jurisdictions holding that such a direction is not error, but we think our own cases controlling.

The next assignment of error relates to refusal of evidence. Dr. Prunty, a witness for plaintiff, had testified that he attended her after the assault and until her miscarriage, which took place about one month thereafter; that in his opinion the miscarriage was the result of the shock and injury of the assault. Plaintiff had testified that in January of 1929, about one year and eight months after her miscarriage of May 14, 1927, (resulting from the assault) she again became pregnant and after about two and one-half months she again miscarried. On this testimony, Dr. Prunty was asked what effect, if any, the first miscarriage would have upon her subsequent miscarriage; to which he replied that one miscarriage predisposes or is inducive of one or more miscarriages, not always, but could not say that the second miscarriage was due to the fact that she had miscarried before. On cross-examination, he

reiterated his opinion that one miscarriage would produce susceptibility to another. He was then asked: ''Doctor, don't you know as a matter of fact that women have, and you in your experience know women that cause miscarriages themselves, and afterwards conceive, and have no trouble at all?'' The form of the question was objected to and the objection was sustained to the form of the question. Defendant excepted, and it is urged now that error was committed in thus limiting the cross-examination. During a further and extended cross-examination, the knowledge of the witness as to the causes of miscarriages was keenly tested. Doctors who testified for defendant were of the opinion that one miscarriage would not predispose to another. We do not think there was reversible error. The extent of cross-examination is largely in the discretion of the trial court, and its rulings thereon will not be reversed except in cases of manifest injustice or abuse. *State* v. *Wolfe*, 99 W. Va. 694, 129 S. E. 748. The same reasons will uphold the trial court in not permitting witness Teahn to give the reasons why defendant company instructed its store managers not to make collections; but this alleged error, saved by special bill, is not insisted upon.

The judgment will be affirmed.              *Affirmed.*