Kathryn **SULESKY**, et al., Plaintiffs,

v.

**UNITED STATES of America,
Defendant.**

**Civ. A. No. 79–2229–CH.**

United States District Court,
S. D. West Virginia,
Charleston Division.

Aug. 12, 1982.

Donald R. Wilson, Gary L. Call, Preiser & Wilson, Legal Corp., Charleston, W. Va., for plaintiffs.

Robert B. King, U. S. Atty., S. D. W. Va., Charleston, W. Va., for defendant.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

The Plaintiffs in this action seek to recover monetary damages against the United States, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., and the National Swine Flu Immunization Program of 1976, 42 U.S.C. § 247b(j), *et seq.* Prior to the trial of this action, the parties stipulated that the Plaintiff, Kathryn Sulesky, had contracted Gullian-Barre Syndrome [GBS] after she received a swine flu shot in 1976. The parties further stipulated that only the issues of causation and damages were to be tried in this action.[1] This Court conducted a four day trial on these issues during the week of June 1, 1982, at the conclusion of which, this Court made a bench ruling wherein it analyzed the evidence in the case and found that the swine flu shot was the proximate cause of Kathryn Sulesky's GBS. Whereupon the Court deferred its determination of the appropriate award of damages until the parties had an opportunity to brief that issue. Those briefs having now been submitted, the Court is now issuing this Memorandum Opinion and Order.

### I. Findings of Fact

#### A. Agreed Upon Facts.

Prior to the trial of this action, the parties submitted to the Court their proposed findings of fact, wherein they agreed to the following findings of fact, which the Court hereby adopts as its own:

1. The Plaintiff, Kathryn Sulesky, received the swine flu immunization shot on October 22, 1976.

2. The shot was received during the course of the mass immunization program instituted and conducted by the Government. [42 U.S.C. § 247b(j), *et seq.*]

3. Kathryn Sulesky was 30 years old when she received the shot.

4. Kathryn Sulesky received the swine flu shot in South Charleston, West Virginia.

5. Kathryn Sulesky is married and has two children who are 11 and 9 years of age.

6. Kathryn Sulesky has a high school education.

---

1. The theory of liability, e.g., negligence, strict liability in tort, breach of warranty, etc., is not an issue in this decision and was not addressed, *explicitly*, by the Court.

7. Kathryn Sulesky has resided in the Charleston, West Virginia, area for over ten years.

8. At the time she received the shot, Kathryn Sulesky was not employed outside the home.

9. At the time she received the shot, Kathryn Sulesky actively carried out the duties and responsibilities attendant to being a wife and mother.

10. Kathryn Sulesky has been a diabetic for approximately the past eighteen years.

11. Prior to October 22, 1976, Kathryn Sulesky had been prescribed and used Valium, Haldol, a mild tranquilizer, and Trioval, an anti-depressant.

12. Kathryn Sulesky's contraction of GBS necessitated her hospitalization for 67 days, from February 12, 1977, to her discharge on April 19, 1977.

13. While so hospitalized at the Charleston Area Medical Center, General Division, Kathryn Sulesky's treating physicians were Dr. Steven Artz and Dr. Curtis Withrow.

14. Due to her GBS, Kathryn Sulesky underwent a tracheostomy on February 18, 1977.

15. The scar resulting from the tracheostomy is permanent.

16. Kathryn Sulesky was on a respirator during a portion of her hospitalization amounting to approximately 27 days.

17. Kathryn Sulesky was a patient in the hospital's Intensive Care Unit [ICU] for approximately 24 days.

18. Kathryn Sulesky required a period of physical rehabilitation as a part of the treatment for her GBS.

19. Kathryn Sulesky incurred the following special reasonable medical bills for the necessary treatment of and rehabilitation from her GBS and its consequences:

| | | |
|---|---|---|
| a. | Drs. O'Dell and Schaefer | $ 665.00 |
| b. | Dr. Artz | 547.00 |
| c. | Dr. Gayeano | 299.00 |
| d. | Dr. Charbonniez | 400.00 |
| e. | Associated Radiologists, Inc. | 39.00 |
| f. | Dr. Lee Pratt | 60.00 |
| g. | Dr. Withrow | 293.00 |
| h. | Dr. Neilan | 97.00 |
| i. | Charleston Area Medical Center | 18,665.80 |

20. Kathryn Sulesky's life expectancy is 42.7 years.

21. Joseph Sulesky was the husband of Kathryn Sulesky at the time she received the shot, was hospitalized and to the present date.

### B. *Causation.*

At the outset, after having fully assessed the evidence on this point, the Court finds that the onset of the Plaintiff's GBS occurred on approximately February 1, 1977, which would place the onset in the fourteenth week after the administration of her swine flu shot on October 22, 1976. Having made this finding, the Court notes that the Government asserts two defenses with respect to the issue of causation.

First, that the Plaintiff's GBS was caused by an unknown etiology or antecedent viral illness, specifically an upper respiratory illness [URI]. In support of this URI defense, the Government relies heavily upon the intake or preliminary diagnosis notes of Dr. Frost Lee, an intern at the Charleston Area Medical Center. When considering all of the medical evidence in this case, including the testimony of Dr. Steven Artz, the other notes which were introduced into evidence and Dr. Robert Waldman's interpretation of the hospital notes involved here, the Court finds that the apparent acute URI was, in fact, if it is to be treated as a diagnosis, a misdiagnosis of the symptoms of GBS. The Court finds, therefore, that there was no antecedent viral or other illness within a one month period prior to the onset of the Plaintiff's GBS. Accordingly, the Court eliminates this as a causative factor in this quotient.[2]

---

**2.** The testimony and other evidence from the treating physicians is overwhelming and thus preponderates that the overall symtomatology described was that of GBS. The treating physi-

cians stated rather candidly that they had very little direct experience with GBS at the Charleston Area Medical Center and that, at least at that point in time, it was very difficult

Second, the Government relies heavily on the testimony of epidemiologists to show, that which it does not have the burden of proving in particular, that the Plaintiff has not, and in fact cannot, show the requisite causative link between the swine flu shot and her GBS. Similarly, the Plaintiffs also rely very heavily upon the testimony of an epidemiologist to establish that the swine flu shot was the cause of the Plaintiff's GBS. From this standpoint, the Plaintiffs have a substantial evidentiary hurdle to overcome in that the onset of Kathryn Sulesky's GBS occurred in the fourteenth week after she received the swine flu shot.

After hearing the sharply conflicting testimony of the various epidemiologists, it was difficult for the Court to determine exactly what to make of it. The Court does find, however, that the epidemiologists have established, to this Court's satisfaction, the following facts:

1. That the swine flu shot can trigger that immunological response, or group of responses, which is characterized or classified as GBS;

2. That there is a significantly higher risk of contracting GBS within two to six weeks after receiving the swine flu shot than there is among the unimmunized population, with the most significant period of risk being from two to four weeks after receiving the shot; and

3. That a causative link has been established to a reasonable degree of medical certainty when the onset of GBS occurs within this two to six week period after receiving the swine flu shot.

What makes this case difficult, and which places one at the hurdle which the Plaintiffs must overcome in establishing the requisite causation by a preponderance of the evidence, is the fact that the onset of Ka-thryn Sulesky's GBS occurred in the fourteenth week after she received the swine flu shot. On this point, the Schonberger Report No. 1, an epidemiological study of 1976 swine flu immunization program, is of some help in that it seems to conclude that there is not a causative link between the swine flu shot and an onset of GBS which occurs more than ten weeks after innoculation. Dr. Langmuir's epidemiological study would apparently agree with Schonberger's, as would most of the other epidemiological studies of the 1976 swine flu immunization program.

Dr. Goldfield adroitly and cleverly, however, demonstrated to the Court that it has to look very critically at the differences and distinctions drawn in these epidemiological studies when the attack rate[3] "tails out" (on a bell-curve graph) and approaches the background rate.[4] All of the epidemiological testimony and other critical evidence highlights the very significant problem, which Dr. Nathanson was candid in recognizing, of actually establishing the proper background rate in a case, such as this one, which is at the end of the bell-shaped curve where the attack rate flattens out and approaches the background rate. What the epidemiological studies demonstrate is a graph of a bell-shaped curve [attack rate] which, depending upon whose testimony the Court would credit, has either an escalating or diminishing bottom line [background rate]. The Court has heard various explanations for why there is a variance, in fact, a variance which it considers relevant in Schonberger's Study No. 1 on the 1976 swine flu immunization program and Schonberger's Study No. 2, which was an epidemiological study of the relationship between GBS and the Russian flu shot. The latter Schonberger study would tend to

to make a correct preliminary diagnosis until the symptomatology fully manifested itself. One of the doctors, in particular, testified that this is a diagnosis that you make better with hindsight when the symptomatology has had some time for maturation.

3. The term "attack rate" as used by the epidemiologists in the context of this civil action refers to the incidence of GBS among that por-tion of the general population which received the swine flu shot.

4. The term "background rate" as used by the epidemiologists in the context of this civil action refers to the incidence of GBS among that portion of the general population which did *not* receive the swine flu shot.

show that the background rate in that study would be as low as .095, whereas, in his earlier study on the swine flu shot, the background rate was .22. The evidence further indicates that the estimates of background rate, which epidemiologists made by factoring in acceptable corrections so as to compensate for underreporting and other like factors, would still place the background rate anywhere from an extreme of .095 per million persons per week on the low end, to an extreme of .44 per million persons per week on the upper end. These are undoubtedly statistical extremes, with the true background rate lying somewhere in between. All of this quite simply demonstrates that the actual background rate for GBS has not yet been established, notwithstanding the very objective and scientific efforts of the epidemiologists which the Court has no intention of deprecating when it makes this finding.

Bearing this in mind, and further realizing that epidemiological studies attempt to address the causative link between a disease and a given variable [in this instance the swine flu shot] by comparing the incidence of the disease in the population exposed to that given variable [attack rate] with the incidence of the disease in the unexposed population [background rate], this Court finds that none of the epidemiological studies introduced into evidence may be employed to *establish* the Plaintiffs' case by a preponderance of the evidence. On the other hand, neither do the studies disprove that the cause of Kathryn Sulesky's GBS was the swine flu shot which she received fourteen weeks before the onset of her GBS. Therefore, while the Court has found the testimony and documentary evidence of the epidemiologists extremely valuable, and while it is not rejected out of hand, the Court does find that expert epidemiological testimony is not determinative of the issue of causation in this case.

Rather, beginning with the unquestioned premise that Kathryn Sulesky did contract a very serious case of GBS, the Court finds that the resolution of the causation issue turns on the testimony of the treating and evaluating physicians. In this regard, the Court has heard the testimony of Dr. Steven Artz, an endocinologist-immunologist, who has treated Kathryn Sulesky over a period of years for her diabetes. While there were some substitute treating physicians attending her initial admission to the Charleston Area Medical Center, Dr. Zaldivar, Dr. Frost Lee and Dr. Curtis Withrow being among them, the Court finds Dr. Artz was the supervising, treating physician.

The Court has carefully assessed Dr. Artz's testimony and has read the hospital notes which were introduced into evidence. The Court has also heard the compelling testimony of Dean Robert Waldman which convinced the Court, and it was not subsequently dissuaded by the testimony of the epidemiologists, that this case turns upon the uncontroverted diagnosis which he made based upon his evaluation of all of the medical evidence before him in the *individualized* case of Kathryn Sulesky. Based upon his diagnosis of the Plaintiff, Dean Waldman testified to a reasonable degree of medical certainty that the swine flu shot caused her GBS some fourteen or fifteen weeks after the shot was administered to her. Dean Waldman further testified that the apparent acute URI was not an antecedent illness which could have been a causative factor in her contraction of GBS.

Based upon the testimony of Dr. Artz and Dean Waldman, and after a careful assessment of the other testimony and evidence in this action, this Court finds by a preponderance of the evidence [5] that the proximate cause of Kathryn Sulesky's GBS was the administration of the swine flu shot and whatever it carried with it which triggered

---

5. Under West Virginia law, "Any preponderance, *however slight it may be,* is sufficient to warrant a verdict for the plaintiff . . . ." *Keener v. Bank,* 114 W.Va. 780, 783–84, 173 S.E. 884 (1934) (emphasis in original), *citing McCul-* *lough v. Clark,* 88 W.Va. 22, 44, 106 S.E. 61 (1921). *See Hovermale v. Berkley Springs Moose Lodge,* 271 S.E.2d 335, 340–41 (W.Va. 1980) (medical experts).

her GBS some fourteen weeks later.[6] Necessarily and appropriately, the Court highly values the testimony of these treating and evaluating physicians. Thus, their expert testimony is more relevant and it is accorded greater weight by the Court than that of the epidemiologists who made diagnostic findings in regard to the cause of Plaintiff's GBS merely by comparing her single occurrence of GBS to a huge statistical universe of GBS incidents and swine flu immunizations. *See generally, Cyrus v. Tharp,* 147 W.Va. 110, 126 S.E.2d 31 (1962); *Nicholas v. Kershner,* 20 W.Va. 251 (1882); *Jarrett v. Jarrett,* 11 W.Va. 584 (1877). *Cf. Ellis v. Commonwealth of Virginia,* 182 Va. 293, 28 S.E.2d 730, 735 (1944) ("The general rule is that, when an attending physician is positive in his diagnosis . . ., great weight will be given by the courts to his opinion.")

## C. *Damages.*

1. Kathryn Sulesky is entitled to recover for her physical injuries, pain and suffering, mental anguish, reasonable and necessary medical expenses and humiliation which resulted from her having contracted GBS. *Long v. City of Weirton,* 214 S.E.2d 832 (W.Va.1975); *William v. Penn Line Service, Inc.,* 147 W.Va. 195, 126 S.E.2d 384 (1962); *Nees v. Julian Goldman Stores, Inc.,* 109 W.Va. 329, 154 S.E. 769 (1930).

### a. Reasonable and Necessary Medical Expenses

■ On February 12, 1977, Kathryn Sulesky was admitted to the Charleston Area Medical Center for the treatment of and rehabilitation from GBS, which at its worst stage struck her with a temporary, total paralysis. Mrs. Sulesky remained hospitalized until April 19, 1977. Throughout the period of her hospitalization and subsequent period of physical therapy and rehabilitation, Kathryn Sulesky incurred medical expenses in the amount of $21,065.80. The Government has stipulated that these medical expenses were reasonable and necessary.

### b. Physical Injury, Pain and Suffering

Within a week of her hospitalization, Kathryn Sulesky required a tracheostomy in order to breathe. It was at this point that she was placed in the ICU where she was put on a respirator for approximately five weeks. While in the ICU, her condition was critical and her paralysis worsened to the point where she could barely nod her head and write with one hand. She could not move for several weeks and had to rely on others to attend to her most basic bodily needs and functions.

Mrs. Sulesky was released from the hospital on April 19, 1977, and required the use of a walker for one to two weeks thereafter, and subsequently had to use a cane for an additional one to two weeks. Relatives resided in her home to assist her in her recovery during the first two weeks after her release from the hospital. After this point in time, however, Mrs. Sulesky, essentially, was able to care for herself. According to her own testimony, she generally reached maximum physical recovery in the midsummer or early fall of 1977.

### c. Permanent Physical Injury

The only evidence supporting a contention of continued impairment of the Plaintiff's physical *abilities* was her testimony that there was a lingering weakness in her right shoulder. The precise degree of this lingering weakness was never established, with the unquantifiable testimony by Plaintiff that her bowling average had decreased as a result of it. Mrs. Sulesky later testified, however, that as of the trial of this action, her bowling average has increased to her pre-illness average.

---

**6.** "[A] '[p]arty committing breach of duty is liable for its natural and proximate effects which may be immediate or through subsequent media of natural forces or other innocent causes.' *Mills v. Insurance Company of North America,* 114 W.Va. 263, 171 S.E.2d 532 (1933)."
*State ex rel Davis Trust Co. v. Sims,* 130 W.Va. 623, 635, 46 S.E.2d 90, 97 (1947). *See Frye v.*

*McCrory Stores Corp.,* 144 W.Va. 123, 107 S.E.2d 378 (1959); *Miller v. Bolyard,* 142 W.Va. 580, 97 S.E.2d 58 (1957); *Trasher v. Amere Gas Utilities Co.,* 138 W.Va. 166, 75 S.E.2d 376 (1953), *appeal dismissed* 347 U.S. 910, 74 S.Ct. 478, 98 L.Ed. 1067 (1954); *Pitzer v. M. D. Tomkies & Sons,* 136 W.Va. 268, 67 S.E.2d 437 (1951).

The only permanent physical disability resulting from the Plaintiff's GBS, therefore, is the scar on her throat which was caused by the necessary tracheostomy. Having observed the scar, and having reviewed the prognosis of Dr. Jacques Charbonniez, the treating cosmetic surgeon, the Court finds that the scar is visually apparent, but not disfiguring.

Other than this scar, for which the Plaintiff is eligible to recover damages, there is no other preponderating evidence which would lead this Court to find that the Plaintiff has suffered further permanent physical injuries as a result of her GBS.

### d. Mental Anguish

■ The uncontroverted testimony of Kathryn and Joseph Sulesky, Dr. Steven Artz and Dr. Curtis Withrow graphically depicted the pain, suffering and mental anguish which Kathryn Sulesky suffered while hospitalized for GBS. The evidence indicates that Mrs. Sulesky remained wholly conscious for the five week period while on a respirator. Throughout those five weeks, she anguished over whether she would recover and whether the respirator would malfunction.

The Plaintiff's testimony also revealed the anguish which she experienced in not being able to converse with or embrace her two young sons when they visited her in the ICU. Mrs. Sulesky also testified as to her concern for her sons' reaction to seeing their mother in the paralyzed condition, and of the anguish which she felt in having to rely entirely on others to attend to her most basic bodily needs and functions. The evidence further indicates that while she was in the ICU that Mrs. Sulesky became so depressed that she expressed to her husband her desire to die, rather than having to continue enduring what she was suffering as a result of her GBS.

Accordingly, this Court does find that Kathryn Sulesky did suffer substantial and intense mental anguish during the period of her hospitalization for, and her subsequent recovery, from GBS.

■ With respect to Mrs. Sulesky's increased nervousness from the time of her recovery in the midsummer or early fall of 1977, to the time of trial, the Court has heard merely the Plaintiff's generalized, conclusory testimony that she has been more nervous, tense and more frequently "short" with her husband and sons during these five years than she was before she contracted GBS. The Plaintiff did not, however, offer any evidence as to the degree or character of Mrs. Sulesky's nervousness, tenseness or shortness as compared to her pre-illness personality. Furthermore, the Plaintiffs adduced no evidence of specific instances to substantiate their conclusory testimony on this point. In addition, no expert testimony was offered to inform the Court as to the existence of a post-illness increased level of nervousness and tenseness, or if such did exist, in what manner it was a result of her illness, or on the other hand, a result of other causes.

While the Court has no reason to doubt the Plaintiffs' contentions that Mrs. Sulesky had been more nervous, tense and more frequently "short" with her husband and sons since her illness, the Court does find that the Plaintiffs have failed to prove to a reasonable degree of medical certainty that this increased nervousness was proximately caused by her GBS and accordingly, cannot recover for this claim.

Inasmuch as the Plaintiffs have not presented any expert testimony or evidence as to Mrs. Sulesky's future, permanent mental anguish or nervousness, this Court finds that she is not entitled to recover for any such future mental anguish or nervousness. *Jordan v. Bero*, 210 S.E.2d 618 (W.Va.1974).

■ 2. As a result of his wife's GBS, Joseph Sulesky suffered a loss of consortium [7] for which he is entitled to recover for

---

7. Under West Virginia law:

"Consortium is a right which the law recognizes in a husband, arising from the marital union, to have performance by the wife of all those duties and obligations in respect of him which she undertook when she entered into the marriage relation, including the right to the conjugal fellowship of the wife, her

in this action. *Ellard v. Harvey*, 231 S.E.2d 339 (W.Va.1976); *Shreve v. Faris*, 144 W.Va. 819, 111 S.E.2d 169 (1959). Mr. Sulesky's recovery, however, is limited to his loss of consortium from the onset of his wife's GBS on February 1, 1977, until her recovery in the midsummer or early fall of 1977, inasmuch as the competent evidence in this case does not indicate that Mr. Sulesky's loss of consortium extended beyond this period of time.

## II. *Conclusions of Law*

1. This Court has subject matter jurisdiction over this action, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, and the National Swine Flu Immunization Program Act of 1976, 42 U.S.C. § 247b(j), *et seq.*

2. This Court has original jurisdiction over this action, pursuant to 28 U.S.C. § 1346(b).

3. In resolving the disputed issues of causation and damages in this action, this Court must apply the law of West Virginia, the forum state. *Ferrero v. United States*, 603 F.2d 510 (5th Cir. 1979); *Funston v. United States*, 513 F.Supp. 1000 (M.D.Pa. 1981); *Sawyer v. United States*, 465 F.Supp. 282 (E.D.Va.1978).

4. Dr. Steven Artz, Dr. Curtis Withrow and Dr. Robert Waldman were qualified to testify upon the issue of the causal relationship between the swine flu shot and Mrs. Sulesky's GBS.

5. The swine flu shot which was administered to Mrs. Sulesky on October 22, 1976, was the proximate cause of the onset of her GBS on February 1, 1977.

6. The United States of America is liable to Kathryn Sulesky for her reasonable and necessary medical expenses in the amount of $21,065.80.

7. The United States of America is liable to Kathryn Sulesky for the permanent scar on her throat in the amount of $5,000.00.

8. The United States of America is liable to Kathryn Sulesky for her physical injuries, pain and suffering and mental anguish in the amount of $150,000.00.

9. The United States of America is liable to Joseph Sulesky for the loss of consortium which he suffered as a result of his wife's GBS in the amount of $10,000.00.[8]

---

company, cooperation and aid in every conjugal relation, fellowship and assistance of the wife, and comfort in her society as to which the right of the husband is peculiar and exclusive; and loss of consortium is the loss of any or all such rights."
*Shreve v. Faris*, 144 W.Va. 819, 824, 111 S.E.2d 169, 173 (1959).

**8.** In arriving at reasonable compensatory damage awards herein, the Court proceeded with an awareness that such awards are not subject to income tax liability. *Norfolk & Western Ry. Co. v. Liepelt*, 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980).