Lawrence M. ABRAMS, M.D.

v.

BAYLOR COLLEGE OF MEDICINE.

Stuart A. LINDE, M.D.

v.

BAYLOR COLLEGE OF MEDICINE.

Civ. A. Nos. H–81–1433, H–82–3253.

United States District Court
S.D. Texas,
Houston Division.

March 5, 1984.

Stuart Nelkin, Nelkin & Nelkin, Houston, Tex., for plaintiff.

Nancy O'Connor, Fullbright & Jaworski, Houston, Tex., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

DeANDA, District Judge.

This cause having been tried upon the facts without a jury, the Court hereby enters the following Findings of Fact and Conclusions of Law, pursuant to Rule 52(a), F.R.Civ.P.

## FINDINGS OF FACT

1. The Plaintiffs are licensed physicians who have been employed by the Defendant Baylor College of Medicine ("Baylor") as anesthesiologists during periods of time which are material to this lawsuit.

2. Plaintiff Lawrence Abrams ("Abrams") began employment for Baylor at the Fondren-Brown Cardiovascular Unit of the Methodist Hospital ("Fondren-Brown") on July 16, 1978. Abrams resigned from this position effective October 30, 1980. Since that time, he has held employment as an Associate Professor of Clinical Anesthesiology and Director of Cardio-Thoracic Anesthesiology at the State University of New York, Downstate Medical Center, Brooklyn, New York.

3. Plaintiff Stuart Linde ("Linde") began employment for Baylor at Fondren-Brown on September 1, 1979, and is still employed by Baylor as an anesthesiologist.

4. Both Plaintiffs have been employed by Defendant under the title of Assistant Professor, Department of Anesthesiology while working for Baylor at Fondren-Brown.

5. Baylor is a large non-profit, private medical institution located in Houston, Texas, which employs several hundred people, including physicians and support staff personnel.

6. Baylor provides anesthesiology staffing at four hospital facilities in Houston, namely Ben Taub Hospital, Jefferson Davis Hospital, the Veterans Administration Hospital, and Fondren-Brown. All anesthesiologists assigned to these hospitals hold faculty positions at Baylor.

7. Fondren-Brown is among the world's foremost cardiovascular surgical units. Such cardiovascular luminaries as Dr. Michael DeBakey perform advanced techniques, including open-heart surgery, at Fondren-Brown. Of the four hospitals staffed by Baylor, the level of cardiovascular work is most intense at Fondren-Brown.

8. A typical operating room team for cardiovascular surgery at Fondren-Brown consists of a surgeon, an assistant surgeon, scrub and circulating nurses, an anesthesiologist, an assistant anesthesiologist, and if a heart-lung machine is in use, a perfusionist. The surgeons, anesthesiologists, and perfusionists are Baylor employees while the nurses are employees of Methodist Hospital who are subject to the direction and supervision of Baylor faculty.

9. The surgery performed at Fondren-Brown is fee-generating. Baylor anesthesiologists receive a portion of these fees as part of their overall compensation. The precise ratio of "regular" salary and fee-sharing for individual anesthesiologists is set by the Chairman of the Baylor Anesthesiology Department, subject to the approval of Baylor's President.

10. In the summer of 1976, members of the Baylor faculty, including Dr. Michael DeBakey, were approached by the Hospital Corporation International ("HCI") regarding a rotation program in which Baylor would send cardiovascular surgical teams to the King Faisal Specialist Hospital and Research Center ("King Faisal") located in Riyadh, Saudi Arabia.

11. A study group of Baylor faculty, including Drs. Arthur Beall (a surgeon) and Sharon Storey (an anesthesiologist), conducted a feasibility study regarding the King Faisal program. This study included an on-site inspection and eventually gave rise to extended negotiations which ultimately culminated in a Memorandum of Agreement, dated October 1, 1977, between Baylor and the King Faisal hospital ("the Agreement").

12. The King Faisal hospital is owned by the Kingdom of Saudi Arabia and has been managed during all material time periods by HCI.

13. Under the Agreement, Baylor received a cash advance to initiate the program and hire replacements for personnel who would be absent due to the rotations. Baylor began sending cardiovascular surgical teams to King Faisal on a rotating basis shortly thereafter. The first such rotation lasted from May 15, 1978 to August 15, 1978.

14. The rotating teams consist of surgeons, anesthesiologists and various oper-

ating room personnel (similar to a typical surgical team at Fondren-Brown).

15. No specific salaries for the Baylor team members are set by the Agreement. Instead, Baylor sets these compensation levels based on what appear (to Baylor administrators) to be sufficient amounts of pay to induce adequate participation in the program.

16. The Agreement provides maximum amounts which are to be reimbursed to Baylor by the Saudis. These amounts are comprised of three categories of reimbursement: (1) "direct costs," which include salaries and benefits; (2) "reimbursables," which include air travel expenses, travel allowances and a per diem schedule for travel time; and (3) "indirect costs," which represent a large percentage of the costs incurred by Baylor in maintaining and administering the program. Under the terms of the Agreement, as amended, the maximum amounts paid by the Saudis to Baylor have increased by 10% for each twelve-month period, beginning with the October, 1981—October, 1982 period. In essence, the Saudis have provided the source of funding for the King Faisal program, and based on the evidence adduced at trial, this funding has been forthcoming in handsome amounts.

17. Participants in the King Faisal program must travel and remain in Saudi Arabia for at least three consecutive months. Participants must secure entry and exist visas from the Kingdom of Saudi Arabia.

18. The salary levels set by Baylor for its anesthesiologists who participate in the program are attractive. The initial salary level for the senior anesthesiologist position was set by Dr. Arthur Beall, who was designated by Dr. DeBakey (President of Baylor at that time) to administer and oversee the King Faisal program. Dr. Beall set the salary levels based largely on the recommendations of Dr. Sharon Storey. Dr. Storey's figures were predicated on the lowest compensation amounts that would induce a substantial number of Baylor anesthesiology faculty members to take rotations in the program. In fact, the annual-ized salary levels for anesthesiologists participating in the program have been at least twice the salary levels for anesthesiologists working for Baylor in Houston.

19. The annualized compensation level for anesthesiologists participating in the King Faisal program in 1978 was approximately $250,000. In 1979, this level rose to $300,000. By 1981, the level of compensation had risen to $350,000, and by 1982, the level of pay was $400,000.

20. As alluded to above, travel expenses of participants are reimbursed by the Saudis. Further, each participant receives ten days of paid administrative leave from Baylor as a fringe benefit. While in Saudi Arabia, Baylor personnel are provided modest but adequate living quarters at a guarded compound near the King Faisal hospital. Baylor personnel are afforded transportation to and from the hospital, if they choose to utilize it. All personnel are free to come and go while residing in the compound.

21. In addition to the monetary benefits associated with participation in the King Faisal program, the program provides valuable clinical experience. In particular, the professional horizons of anesthesiologists are substantially expanded due to the markedly higher incidence of congenital and heart-valve (rheumatic fever) diseases which are treated at King Faisal. By contrast, cardiovascular treatments at Baylor predominantly involve coronary artery disease, so that working in the rotation program heightens a physician's experience in dealing with pediatric patients and with patients suffering from the ravages of rheumatic fever.

22. The Agreement contains no criteria or requirements regarding which persons are eligible to serve as anesthesiologists in the rotation program other than provisions such as "Baylor will provide ... a senior cardiac anesthesiologist, who will be responsible for overall supervision of the anesthesia portion" of the program. Baylor has established its own criteria for the position of senior cardiac anesthesiologist.

23. The objective criteria established by Baylor for participation in the program (re-

garding anesthesiologists) are that (1) the person must be a member of the Baylor Department of Anesthesiology faculty; and (2) that the person must be certified by the American Board of Anesthesiology or hold an equivalent foreign certification recognized by the American Board of Anesthesiology.

24. The evidence clearly establishes that both Plaintiffs met the objective criteria set forth immediately above during times material to this lawsuit.

25. In addition to the objective criteria, Baylor has posited what may be labelled as the "team player criteria" as being necessary to qualify for the program. (We note that this "team player" qualification was raised at trial but was not put before the EEOC.) The Court is not convinced that a requirement of being a "team player" is in any way objective in nature. "Team player" requirements are innately subjective and amorphous. As such, the Court finds that the "team player criteria" are not objective occupational requirements.

26. The responsibility for designating the anesthesiologists who are to participate in the program is exercised by the Chairman of the Anesthesiology Department, who currently is Dr. Dean Morrow. Formerly, Dr. Lawrence Schuhmacher served as Chairman. Once the physicians (and other rotation participants) have been designated, Baylor provides them with various forms to complete, including a visa application card supplied by HCI. The completed forms are returned to Ms. Dorothy Hosely, administrative secretary to Dr. Beall, who oversees the program.

27. The visa application card contains a line for indicating a person's religious preference. The applications are eventually forwarded to the Saudi government for approval. Ms. Hosely testified that every line of the applications must be completed prior to processing the applications, and that in the past, when persons indicated "no preference" under "Religion," the persons were required to name a preference.

28. Ms. Hosely testified that the Saudi visas were usually issued within 24 hours of submission. Further, problems arising out of visa applications for Baylor employees have been quite rare and have been resolved expeditiously. When problems have arisen, either Dr. Beall or Dr. DeBakey has interceded and has been successful in obtaining the visa. It is therefore fairly apparent that the Saudi government has been very cooperative in dealing with visa applications for Baylor personnel who are designated to participate in the King Faisal program.

29. The evidence shows that no qualified medical personnel employed by Baylor who are Jewish have been afforded any rotation in the King Faisal program.

30. In particular, Dr. Lewis Coveler, currently Chief of Anesthesiology Services at Ben Taub Hospital and an Associate Professor at Baylor, had been led to believe that he would participate in the program but was never designated to do so by the Chairman. Dr. Coveler is qualified to participate, and he is Jewish. Dr. Coveler was informally assured of a spot on the rotations by Dr. Schuhmacher prior to the first rotation's departure for Saudi Arabia. As was required by Baylor policy, Dr. Coveler attended an orientation meeting in April, 1978, held jointly by Baylor and HCI. The orientation was held for all Baylor personnel who were designated to participate in the program. Although Dr. Coveler had agreed to participate, his name had been removed from the list of designees by the time of the meeting.

31. Dr. Coveler subsequently took up this matter with Dr. Schuhmacher, who was Chairman of Anesthesiology at that time. Very shortly thereafter, Drs. Schuhmacher, Beall and Coveler met to discuss the matter. The subject of Judaism arose, and Dr. Schuhmacher stated that he would ascertain whether Jews could be included in the rotations to Saudi Arabia, since the Saudis have an apparent hostility to Jews.[1]

32. Dr. Schuhmacher took part in the first rotation to King Faisal. Although he

1. For example, evidence was adduced at trial to show that Saudi visa applications are routinely

denied when an applicant's passport indicates

did not speak with Saudi officials regarding the matter, he concluded that Jews would not be allowed entry visas into Saudi Arabia. He relayed these conclusions to Dr. Morrow and to other Baylor faculty.

33. Dr. Beall and Dr. Morrow have stated that they are of the opinion that Jews could not participate in the King Faisal program because they believe the Saudi government would not allow Jews to enter their country. Dr. Morrow expressed this opinion to various members of the Baylor anesthesiology faculty on a number of occasions. Moreover, Dr. Morrow told Plaintiff Abrams that he felt it was dangerous for Jews to go to Saudi Arabia. Dr. Sharon Storey, who participated in preparing the lists of designees, stated that his concern for the safety of Jews in Saudi Arabia was a factor in his opinion that Jews should not participate in the program.

34. It is apparent that these views, expressed by the various doctors who were in charge of different phases of the program, were widely disseminated among Baylor faculty and became a frequent topic of discussion among Baylor employees who were interested in the King Faisal program.

35. It is worth note at this juncture to point out that Baylor has never had any express agreement or understanding with the Saudis to the effect that Baylor would not send Jews on the rotation program. Further, Baylor has never been given any notification by the Saudi government that Jews would not be allowed to participate in the program. While there appears to have been some discussion of this issue on the part of Baylor officials and HCI personnel, this discussion occurred sometime between the signing of the Agreement and the date of the first rotation. The exact nature of the discussion and the conclusions which flowed from it, if any, are not clear. The issue was not discussed during the negotiation meetings which led to the Agreement.

that he or she has visited Israel. The United States, however, often issues "substitute" passports to persons encountering this problem. These passports do not reflect visits to Israel.

36. Dr. Morrow expressed his views regarding the inability of Jews to participate in the program to Dr. Allen Hyman while Morrow was engaged in recruitment efforts for Baylor. In October, 1978, Dr. Morrow stated to Dr. Hyman (a Jewish anesthesiologist at Columbia University) that Jews and women were not eligible for the King Faisal program. When pressed for details by Dr. Hyman, Morrow's response was that he "could not accept Jews" for the rotations.

37. Dr. Abrams first learned of the King Faisal program at a meeting with Dr. Morrow, held a few days before Dr. Abrams first reported for duty at Baylor. Dr. Morrow knew that Abrams is Jewish and advised him that this fact would preclude his participation in the program. Later, Dr. Schuhmacher told Abrams that the Saudis did not want Jews to visit their country.

38. Dr. Abrams eventually became a spokesman for Baylor personnel who were protesting the marked inequities in compensation between faculty members who went on rotations to King Faisal and faculty members who did not. Dr. Storey resented Dr. Abrams' protests and Dr. Abrams was later transferred, over his objections, from Fondren-Brown to Ben Taub Hospital. The Court finds that this transfer resulted from official displeasure with Dr. Abrams' protestations, and that this transfer had a deleterious impact on his research projects.

39. Dr. Abrams persisted in his desire to participate in the program, even after his transfer to Ben Taub Hospital. As noted above, Dr. Abrams was fully qualified to participate in the King Faisal program. Further, he possesses an outstanding *curriculum vitae* and has received glowing letters of recommendation, including one written by Dr. George Noon, Professor of Surgery at Baylor.[2]

2. The Court is not persuaded by Baylor's attempts to paint a picture of Dr. Abrams as being noncooperative, difficult to work with, and a person with a volatile ego. These attempts merely reflect an effort to label Abrams as a man who is not a "team player."

40. The Court finds that if Baylor had permitted Dr. Abrams to participate in the King Faisal program, he would have done so. Moreover, based on the evidence we heard regarding the mechanics of the rotation program and based on the length of his tenure at Baylor, the Court finds that Dr. Abrams would have participated in at least three rotations to King Faisal. (For example, Dr. Beall has taken five rotations during the time of the program and various other physicians have each taken three or four rotations.)

41. The Court finds that the only reason that Dr. Abrams did not participate is because the Baylor physicians who administered the program (excluding Dr. DeBakey, who did not actively engage in the administration process) repeatedly made it clear that Jews were not eligible for the program.

42. Dr. Linde first learned of the King Faisal program from Dr. Abrams, shortly after he (Linde) began working at Fondren-Brown. Dr. Linde discussed the program with Dr. Storey, who confirmed the fact that Jews were not eligible. Dr. Storey expressed his regrets and sympathy to Linde about this state of affairs, as did Dr. Morrow at a later time.

43. Shortly after his arrival at Fondren-Brown, Dr. Linde became fully qualified for the King Faisal program. A South African anesthesiologist who has worked with Dr. Christian Barnard, Dr. Linde has received a South African Fellowship in anesthesiology, which is recognized as an equivalent to certification by the American Board. Dr. Linde possesses outstanding professional qualifications.

44. The Court finds that if Baylor had allowed Dr. Linde to participate in the King Faisal program, he would have done so. Further, the Court finds that Dr. Linde would have participated in four rotations in the King Faisal program.

45. The Court finds that, as was true of Dr. Abrams, the sole reason for Dr. Linde's non-participation in the program is because Baylor administrators made it clear that Jews could not participate in the rotations.

46. The Court finds that Baylor has not established any bona fide justification for excluding Jews from the King Faisal program. These exclusionary practices were undertaken unilaterally by Baylor's administrative officials. There is no evidence to show that Baylor officials took any appropriate steps to determine the actual policy of the Kingdom of Saudi Arabia toward Jews participating in the program. Moreover, Baylor took no steps to alleviate or rectify the effects of any perceived discriminatory practices and policies on the part of the Saudis.

47. The ready acquiesence of Baylor officials in furthering the percevied Saudi exclusion of Jews is in stark contrast to the non-discriminatory policies which were implemented by two other institutions engaged in programs similar to the King Faisal rotations. Officials of both the University of Colorado Medical School and the University of Washington Medical School insisted that non-discrimination clauses be included in the agreements they entered into with the Saudis and that those clauses would be enforced. There is no reason to conclude that Baylor would have been unable to achieve the same results if it had only attempted to do so.[3]

48. The Court finds that the discrimination against Jews was intentional, and that there was indifference and insensitivity on the part of the Baylor officials who actually administered the King Faisal program regarding the issue of whether Jews could participate in that program.

49. The Court finds that the "factual bases" (or motives) on which these administrators decided that Jews were to be excluded include (1) informal conversations in

---

**3.** In fact, the Court heard evidence regarding an incident which involved the use of blacklisted equipment which is significant. Baylor designated a Travenol pump oxygenator for use at King Faisal. The Saudis vetoed this designation for the reason that Travenol Corporation was on

the Arab Blacklist. Baylor officials insisted on the necessity of utilizing the Travenol machine in the program and, without great difficulty, obtained a waiver of the ban on Travenol products from the Saudis.

Riyadh and various gleaned impressions to the effect that the Saudis did not want any Jews in their country; and (2) a paternalistic "concern" for the safety of Jews traveling to Arab lands. Furthermore, an examination of the totality of the evidence leaves this Court with the firm impression that the implicit reason behind Baylor's exclusion of Jews from the program was the desire to avoid "rocking the boat" vis-a-vis the Saudis. The Baylor officials were utterly indifferent to the clearly discriminatory effects which the exclusionary practices imposed on their Jewish employees.

50. Dr. Michael DeBakey, who is director of the program but who was not involved in the details of overseeing and administering it, testified that if he had known a Baylor employee could not participate in the program because of his or her race or religion, he would have corrected the problem or ended the Agreement. Dr. DeBakey stated that, as Chancellor of Baylor, he would cancel any program where Jews were excluded and that his staff is aware of his views regarding such discriminatory practices. Unfortunately, the problem of Jews participating in the program was never brought to Dr. DeBakey's attention by his subordinates who administered the program. If only his administrators (Drs. Morrow, Beall, *et al.*) had shared Dr. DeBakey's commitment to non-discriminatory policies and practices, then we would not have this lawsuit before us.

51. Dr. Linde filed a charge of discrimination with the EEOC on February 18, 1982. Baylor has sent teams on rotation to King Faisal (including anesthesiologists) within 180 days preceding the filing of his charge and every three months since his charge was made. As noted earlier, Dr. Linde has been continuously employed by Baylor since September 1, 1979.

52. Dr. Abrams filed a charge of discrimination with the EEOC on November 7, 1980, and amended his charge on November 29, 1980. Baylor sent rotation teams to King Faisal within 180 days preceding the filing of the charge. Dr. Abrams was employed by Baylor from July 16, 1978 until October 30, 1980.

53. Both Plaintiffs received notices of the right to sue from the EEOC and timely brought their actions in federal court.

54. The Court finds that the discriminatory actions taken by Baylor deprived the Plaintiffs of substantial employment opportunities and that these actions resulted in monetary losses to the Plaintiffs, based on entitlement to back pay and lost benefits.

55. Dr. Abrams' actual earnings from Baylor during the material times are as follows:

| Budget Year | Baylor Salary | Patient Fees | Actual Earnings |
| --- | --- | --- | --- |
| 1978–1979 | $47,916.59 | $33,329.75 | $81,246.34 |
| 1979–1980 | 51,969.84 | 35,930.04 | 87,899.88 |
| 1980–1981 | 25,316.06 | 6,458.38 | 31,774.44 |

Dr. Abrams' annualized rate of compensation was:

| | | |
| --- | --- | --- |
| 1978–1979 | = | $84,367.60 |
| 1979–1980 | = | 87,899.88 |
| 1980–1981 | = | 95,323.32 |

56. Based on all the evidence presented at trial, the Court finds that Dr. Abrams would have participated in a total of three rotations which would have been compensated at annualized rates of $250,000 for the first rotation and $300,000 (each) for the other two. After making the appropriate deductions for receipt of Baylor salaries and fee-sharing compensation, and after making calculations based on the quarterly nature of each rotation, the Court finds that Dr. Abrams is entitled to $145,602.30 in back pay for the periods in question. Moreover, Dr. Abrams is entitled to recover for the various days of administrative leave which he would have received as part and parcel of the rotations. Assuming three rotations, the amount of recovery for lost leave is $11,238.00. The total amounts of these awards to Plaintiff Abrams is $156,840.30.[4]

---

**4.** The Plaintiffs presented evidence regarding various fringe benefits of the program, such as travel fare and housing in the compound. These items, however, do not reflect real lost income. Rather they are expenses incurred in making the rotations which were defrayed for participants. Hence such items should not be included in our awards for back pay and lost benefits. We note that the Plaintiffs offered evidence regarding "interest losses" on back pay. The Defendant has argued that the figures

57. Dr. Linde's actual earnings from Baylor during the material times are as follows:

| Budget Year | Baylor Salary | Patient Fees | Actual Earnings |
|---|---|---|---|
| 1979–1980 | $39,100.00 | $27,566.70 | $ 66,666.70 |
| 1980–1981 | 64,839.84 | 35,160.00 | 99,999.84 |
| 1981–1982 | 73,009.92 | 76,990.00 | 149,999.92 |
| 1982–1983 | 79,206.96 | 83,186.00 | 162,392.96 |
| 1983–1984 | 13,860.32 | 14,523.50 | 28,383.82 |

Dr. Linde's annualized rate of compensation was:

| | | |
|---|---|---|
| 1979–1980 | = | $80,000.00 |
| 1980–1981 | = | 99,999.84 |
| 1981–1982 | = | 149,999.92 |
| 1982–1983 | = | 162,392.96 |
| 1983–1984 | = | 170,302.92 |

58. Based on all the evidence presented at trial, the Court finds that Dr. Linde would have participated in a total of four rotations which would have been compensated at annualized rates of $300,000 (each) for the first two rotations and $400,000 (each) for the other two rotations. After performing the calculations discussed above (regarding Abrams' losses), the Court finds that Dr. Linde is entitled to back pay in the amount of $229,326.08. His award for lost administrative leave is $19,656.00. The total amount of Dr. Linde's awards is $248,982.08.

59. The Plaintiffs have argued that they should be entitled to recover compensatory damages for the mental anguish and humiliation they suffered because of Defendant's discriminatory actions. The Court finds that such a recovery would not be proper in this case simply because the proffered evidence on this element is insufficient to support a finding of humiliation and mental anguish.

60. The discriminatory actions of Baylor were, as noted above, the result of intentional discrimination, together with indifference and insensitivity. However, the Court does not find that the conduct was so wilfully malicious and egregious as to support the imposition of punitive damages.

given by the Plaintiffs' expert witness regarding lost interest are based on incorrect premises and speculative assumptions. The Court agrees with the Defendant on this point. The evidence

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f); 28 U.S.C. §§ 1331, 1337, 1343, 2201, and 2202; and 50 U.S.C.App. § 2407 *et seq.*

### A. The Title VII Claims

2. Defendant Baylor College of Medicine is an "employer" within the meaning of 42 U.S.C. § 2000e *et seq.*, which employed the Plaintiffs during times material to this lawsuit.

3. The Court concludes that the Plaintiffs' EEOC charges were timely filed. The facts of this case place it within the ambit of *Perez v. Laredo Junior College,* 706 F.2d 731 (5th Cir.1983), wherein the court held that where the statutory violation occurs as a result of a continuing policy, itself illegal, then the statute of limitations does not foreclose an action aimed at the defendants' continuing enforcement of the illegal policy. *Id.,* at 733–734 and cases cited therein. Moreover, every time the Defendant selected a rotation team and that selection process excluded Jews from the team, a new and continuing violation occurred.

4. The Defendants have argued that the Plaintiffs' cause must fail because they never applied for participation in the King Faisal program. This argument is ill-founded for two reasons. First, the Supreme Court held in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), that where the act of formal application would be futile, the fact that a plaintiff never applied does not preclude recovery. For example:

> If an employer should announce his policy of discrimination by a sign reading "Whites Only" on the hiring door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs. The same message can be communicated to

regarding the interest losses is not of a sufficiently certain nature to support an award for such losses.

potential applicants more subtly but just as clearly by an employer's actual practices ... When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application. *Id.*, at 365–366, 97 S.Ct., at 1870.

In this case, the repeated message to Baylor employees was "Non-Jews Only." Hence the Court concludes that *Teamsters* applies and that the Plaintiffs are not precluded from recovery. But for Baylor's overt discrimination, the Plaintiffs would have "applied." *See also Gifford v. Atchison, Topeka and Santa Fe Ry. Co.*, 685 F.2d 1149, 1154 (9th Cir.1982). The second reason why Defendant's argument cannot be sustained is because the facts show that there was no formal application process. Rather, Baylor's administrators of the program designated team members. Information regarding who was interested in participating as designees was spread by word-of-mouth. The facts show that the desire of the Plaintiffs (and of other Jewish employees) to participate in the program was informally communicated to those in charge of designating the members of the rotation teams. This is sufficient, under the facts, to defeat Baylor's argument.

■ 5. The Plaintiffs have established, by a preponderance of the evidence, that (1) they sought positions in the King Faisal program; (2) they were fully qualified to participate in the program; (3) their requests to participate in the program were denied because they are Jews; and (4) that following these denials, Baylor persisted in designating non-Jewish participants. Therefore, they have established a *prima facie* case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

6. Baylor has failed to establish legitimate business reasons for its discriminatory actions. The decision to exclude Jews

was based on stereotyped impressions of a religious (or racial) class, namely, persons who are Jewish. *City of Los Angeles, Dept. of Water and Power v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978); *Capaci v. Katy & Besthoff, Inc.*, 711 F.2d 647 (5th Cir.1983). As such, their posited business reasons are obviously pretextual as a matter of law.

7. The patronizing, paternalistic "concerns" of Baylor for the safety of Jews in Saudi Arabia is not a defense to the Plaintiffs' Title VII actions. Rather, such behavior is clearly violative of Title VII. *Weeks v. Southern Bell Telephone & Telegraph Co.*, 408 F.2d 228 (5th Cir.1969); *see also Burwell v. Eastern Airlines, Inc.*, 633 F.2d 361 (4th Cir.1980). Moreover, the reasons behind the exclusion of Jews do not qualify as a bona fide occupational qualification ("BFOQ"). *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1276–1277 (9th Cir.1981).

■ 8. The Court concludes the exclusion of Jews from the King Faisal program was not justified by either a business necessity or by a BFOQ. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).[5]

9. In any event, the Court concludes that the Plaintiffs have amply met their burden of showing discrimination *vel non*, which is the ultimate issue in a Title VII case. *United States Postal Service Board of Governors v. Aikens*, — U.S. —, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

10. The Plaintiffs are entitled to recover back pay awards which completely redress the economic injury which has resulted from the unlawful discrimination. *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444; *Rasimas v. Michigan Dept. of Mental Health*, 714 F.2d 614 (6th Cir.1983). The Court therefore concludes that the Plaintiffs are entitled to recover the amounts set forth above in the Findings of Fact.

---

**5.** The Defendant contends that the Plaintiffs have failed to offer any rebuttal of these defenses. This failure (if indeed the contention is

correct) is not fatal since it is clear to the Court that the Defendant has failed to prove *legitimate* defenses.

11. The Plaintiffs are entitled to an award of prejudgment interest at the rate of 6% per annum. *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 263 (5th Cir.1974), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). This interest should accrue based on the last available rotation dates for each year in which the Plaintiffs would have participated.

12. The Plaintiffs are entitled to post-judgment interest at the rate provided by law.

■ 13. Prevailing plaintiffs in a Title VII case are entitled to recover attorney fees and taxable costs (including expenses related to expert witnesses). *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974); *Russell v. Curtin Methesoa Scientific*, 27 FEP Cases 1336 (S.D. Tex.1981).

■ 14. In addition to monetary awards, prevailing Title VII plaintiffs are entitled to appropriate injunctive relief. Absent clear and convincing proof that there is no reasonable probability of further noncompliance with the law, a grant of injunctive relief is mandatory. *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 354 (5th Cir.1977). There is no such clear proof regarding future noncompliance in this case, and therefore we must hereby permanently enjoin the Defendant from excluding qualified Jews from the King Faisal rotation program. Further, Plaintiff Linde must be given a preference for the next available rotation to Saudi Arabia as a necessary component of appropriate injunctive relief. *Garza v. Brownsville I.S.D.*, 700 F.2d 253 (5th Cir.1983).

15. The Court concludes that the Plaintiffs are not entitled to any further relief, based upon their Title VII claims, other than that which has been set forth above.

B. The Export Administration Act

16. In addition to their Title VII claims, the Plaintiffs have alleged a cause of action for violation of the Export Administration Act of 1979, as amended, 50 U.S.C.App.

§ 2401 *et seq.* ("EAA") which relate to foreign boycotts. The threshold question regarding this asserted cause of action is to determine whether an implied private cause of action exists under the EAA. Prior to trial, the Court held that, based on an application of the factors enumerated in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) to the instant dispute, there is an implied private cause of action. The Defendant has continued to challenge this ruling, but the Court concludes that we should adhere to the initial decision for reasons which are set forth below.

17. Subsequent to our initial order holding that the Plaintiffs have an implied private cause of action, a decision was issued in *Bulk Oil A.G. v. Sun Co.* 583 F.Supp. 1134 (S.D.N.Y.1983), which held that there was not an implied private cause under the EAA. As the *Bulk Oil* court correctly noted, recent authorities indicate that the greatest weight is to be given to the second *Cort* factor, congressional intent.[6] *Bulk Oil*, at 1139. A careful review of *Bulk Oil* discloses that the most significant item of legislative history (upon which that Court concluded that a private cause should not be implied) is a 1976 House bill which provided for a recovery of treble damages together with attorney fees for victims of actions made illegal by the EAA. This bill was not passed by both houses of Congress and did not reappear in either the House or Senate version of the 1977 legislation. The Court agrees with the Plaintiffs regarding the true significance of this particular history. The Plaintiffs argue that the "non-passage" of the House bill is not dispositive of the second *Cort* factor as it relates to the instant case for three reasons. First, the 1976 provision provided for treble damages rather than actual damages. Second, the 94th Congress, which expired in 1976, never expressly rejected the 1976 House bill but rather simply adjourned without taking final action on that bill. Third, the bills that directly led to the 1977 act never contained any language which would have either "created" or

---

6. The other three factors are (1) whether the plaintiff is one of the class for whose especial benefit the statute was enacted; (2) whether implying a cause is consistent with the underlying purposes of the legislative scheme; and (3) is the cause of action one which has been traditionally relegated to state law.

"denied" a private cause of action. H.R. 5840, tit. II, 95th Cong., 1st Sess. (1977); S.69, tit. II, 95th Cong., 1st Sess. (1977); *see Cort,* 422 U.S., at 78, 95 S.Ct., at 2087. Moreover, Judge Friendly has observed that it is unwise to infer Congressional rejection from Congressional inaction. *Leist v. Simplot,* 638 F.2d 283 (2d Cir.1980—*per* Friendly, J.), *aff'd sub nom., Merrill Lynch v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). We conclude, based on the above discussion, that this aspect of the congressional intent, as evidenced by the legislative history of the EAA, does not foreclose an implied private cause of action.

18. The background of the anti-boycott provisions of the EAA is significant. In the mid-1970s, Congress became very concerned regarding efforts by Arab countries to pressure American companies into furthering their boycotts of Israeli interests. *See e.g.,* S.Rep. No. 95–104, 95th Cong., 1st Sess. (1978), esp. at 16–19. As a result of this concern, Congress enacted anti-boycott legislation as an amendment to the EAA [Pub.L. 95–52, 91 Stat. 235 (1977)]. The anti-boycott rules were reenacted as part of the 1979 version of the EAA (Pub.L. 96–72, 93 Stat. 503, codified as 50 U.S.C.App. § 2401 *et seq.*). This background, together with a thorough reading of the EAA, as amended, and the regulations promulgated pursuant thereto,[7] leads us to the conclusion that the "especial class" of persons to be protected by the EAA is comprised not only of Israelis but of American Jews as well. Moreover, we believe that the legislative history, viewed as a totality, militates in favor of implying a private cause of action.

19. The Court concludes that in light of the points discussed above, it follows by necessary implication that an implied cause of action for American Jews who have been discriminated against in furtherance of an Arab boycott is consistent with the underlying purposes of the legislative scheme.

20. Turning to the last *Cort* factor, the Court knows of no traditional state law which would govern the type of cause which could be implied from the EAA.

■ 21. The Court concludes that all of the *Cort* factors weigh heavily in favor of implying a private cause of action under the EAA for Jewish persons who have been injured by acts made illegal by the EAA.

22. Having determined that the Plaintiffs may bring a private cause under the EAA, we must decide whether Baylor is liable under it. In order to establish a violation of the EAA, there must be a showing as intent. The relevant definition of intent is as follows:

> Part 369 prohibits a United States person from taking or knowingly agreeing to take certain specified actions with intent to comply with, further, or support an unsanctioned boycott... Intent is a necessary element of any violation of this part. It is not sufficient that one take action that is specifically prohibited by this part. It is essential that one take such action with intent to comply with, further, or support an unsanctioned boycott. Accordingly, a person who inadvertently, without boycott intent, takes a prohibited action, does not commit any violation of this part. 15 C.F.R. § 369.-1(e).

Relevant portions of 15 C.F.R. § 369.2(b) provide:

> (1) No United States person may:
>
> (i) refuse to employ or otherwise discriminate against any individual who is a United States person on the basis of race, religion, sex or national origin; ...
> (3) The section does not supersede or limit the operation of the Civil Rights Laws of the United States. Examples of Discriminatory Actions.

> The following examples are intended to give guidance in determining the circum-

---

**7.** 50 U.S.C.App. § 2407; Exec. Ord. No. 12214; 45 Fed.Reg. 29783; 15 C.F.R. § 369 *et seq. Esp.*

*see* 15 C.F.R. § 369.2(b) and example (i) thereof.

stances in which the taking of particular discriminatory actions is prohibited....

(i) U.S. construction company A is awarded a contract to build an office complex in boycotting country Y. A, *believing* that employees of a particular religion will not be permitted to work in Y because of Y's boycott against country X, excludes U.S. persons of that religion from consideration for employment on the project.

A's refusal to consider qualified U.S. persons of a particular religion for work on the project in Y constitutes a *prohibited boycott-based discriminatory action* against U.S. persons on the basis of religion. (Emphasis added.)

These regulations must serve as guidance to the Court in determining the liability issue. *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 371–372, 93 S.Ct. 1652, 1661–1662, 36 L.Ed.2d 318 (1973).[8]

23. The Plaintiffs are United States persons within the meaning of the pertinent regulations.

24. The Defendant is a United States person within the meaning of the pertinent regulations.

■ 25. The above example of conduct which violates the EAA so closely parallels the conduct of the Defendant in this case that the Court concludes that the Defendant has violated the EAA. This conclusion rests not only on the example itself but on the terms of the EAA, the policies underlying it, and the regulations promulgated pursuant to it as they are applied to the instant facts. All necessary elements, including boycott intent, have been established. Finally, most if not all of the proscribed activity of the Defendant occurred after the effective date of the anti-boycott amendments to the EAA.

26. We must now turn to the issue of appropriate damages for violation of the EAA. Since the Supreme Court's decision in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct.

473, 5 L.Ed.2d 492 (1961), federal courts have consistently allowed a recovery of money damages resulting from acts of discrimination and violations of civil rights even when a statute is silent as to the appropriate remedies. *E.g.*, *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Williams v. Matthews Co.*, 499 F.2d 819 (8th Cir.), *cert. denied* 419 U.S. 1021, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974). These cases teach us that a plaintiff's recovery should encompass an award of compensatory and punitive damages, where appropriate.

27. In the instant case, the Plaintiffs certainly suffered serious economic damages. However, the Court concludes that these losses will be fully compensated by the awards of back pay and prejudgment interest which were granted to Plaintiffs as part of their Title VII remedies. To duplicate recovery for those losses here would be an unjust windfall to the Plaintiffs.

■ 28. The Plaintiffs are not entitled to recover compensatory losses for humiliation and mental anguish since these claims have not been proven by a preponderance of the evidence to a reasonable degree of certainty. *See e.g.*, *Sulesky v. United States*, 545 F.Supp. 426 (S.D.W.Va. 1982); *Davis v. Green*, 188 F.Supp. 808 (W.D.Ark.1960).

■ 29. The Plaintiffs are not entitled to recover punitive damages since the Court found that, while the discriminatory actions of the Defendant were intentional, the actions were not so egregious or malicious as to support the imposition of punitive damages.

### C. Conclusion

30. In light of these Findings and Conclusions, Counsel for the parties are to submit a memorandum of proposed Final Judgment setting out (1) the monetary recovery of each Plaintiff; (2) the date(s)

---

8. The relevant holding of *Mourning* relates primarily to the question of proper remedial measures. The Court concludes that, by simple analogy, the deference to agency guidelines approved by the *Mourning* court should be extended to certain liability issues, unless they are clearly inappropriate for some controlling legal reason.

from which the award of prejudgment interest is to accrue and the amounts thereof; (3) the appropriate amount of attorney fees, if agreed upon by the parties; and (4) the injunctive relief. If the parties cannot agree to the amount of attorney fees, the Plaintiffs' counsel shall file the appropriate affidavits and argument regarding attorney fees within 20 days. The Defendants shall file any controverting affidavits and arguments regarding these matters within 10 days thereafter. If, within 5 days of that time, counsel for the parties are unable to reach agreement regarding all aspects of the proposed Final Judgment, then counsel shall notify the Court to that effect, and a hearing will be set to resolve these remaining matters.