**Jerrold S. PIME, Plaintiff,**

v.

**LOYOLA UNIVERSITY OF CHICAGO, an Illinois not-for-profit corporation, Defendant.**

**No. 80 C 1906.**

United States District Court, N.D. Illinois, E.D.

April 27, 1984.

---

Jerrold S. Pime, pro se, and Paula K. Jacobi, Hoffman & Davis, Chicago, Ill., for plaintiff.

William H. Oswald, Leon S. Conlon, Loyola University of Chicago, Chicago, Ill., American Jewish Congress, for defendant.

### Memorandum

LEIGHTON, District Judge.

This suit is by a former part-time lecturer in philosophy who alleges that his university employer violated § 703(a), Title VII of the Civil Rights Act of 1964, by refusing to consider him for a full-time, tenure-track teaching position because he is a Jew, but hired three Catholics, all of them Jesuits. The university has answered, denied the allegations of employment discrimination, and has asserted two affirmative defenses.

After the end of discovery and other pretrial proceedings, the cause has been tried to the court, evidence has been submitted consisting of testimony of witnesses and exhibits. Oral arguments in summation have been presented; and the parties were invited to propose findings and conclusions. Therefore, as required by Rule 52(a), Fed.R.Civ.P., the court makes its findings of fact, reaches its conclusions of law, and based thereon, enters judgment accordingly.

### I

Loyola University of Chicago is an institution of higher learning that traces its history from St. Ignatius College established by four Jesuit priests and chartered by the State of Illinois on June 30, 1870. Jesuits are members of the Society of Jesus, a religious order of the Roman Catholic Church originally founded by Ignatius Loyola in 1534. Their history has been characterized by a particular energy in the promotion of education. In furtherance of their heritage, Jesuits have established several universities, including those in Chicago, New Orleans, Louisiana, and in the State of California. St. Ignatius College became Loyola University of Chicago in 1909 when new articles of incorporation were authorized. It is today an Illinois not-for-profit corporation; its charter does not make it a religious institution.

Loyola's avowed purpose, according to its articles of incorporation, is to "provide and furnish opportunities for all branches of higher education ... which may comprise literature, law, medicine, dentistry, the sciences, fine arts," and to hold and disburse monies "for educational purposes." Its additional purpose, according to its by-laws, is "the pursuit of truth in all the cultural, scientific and professional branches of sacred and secular learning." In its curriculum, both core and electives, the offerings of religious courses by Loyola are not numerous; indeed, the study of religion appears to play a minor, although not insignificant, role in the day-to-day activities of the university.

One manifestation of this fact is the absence of any requirement, in any of Loyola's ten schools and colleges, that a student take a course either in Catholicism or in the history of the Society of Jesus, the only exception being pursuit of a degree in University College, or in the College of Arts and Sciences, with theology as a major. Under its corporate by-laws, the president must be a Jesuit. But authority over university policy and governance is vested, by Illinois law, in a board of trustees the majority of whose members, since 1970, have been non-Jesuits. In 1980, members of the board consisted of twenty-three persons, nine of whom were Jesuits.

The by-laws of the university require that one more than one-third of the board's full membership be members of the Society of Jesus, and that any by-law amendment be approved by two-thirds of the trustees. A majority of them are men and women from various walks of life and of various religious faiths who have authority to act if a majority or a quorum votes in favor of an action. As is common in any university setting, the daily management of Loyola is in the hands of its president, vice president, deans, chairmen of various departments, and the heads of divisions within the university administration. However, the Society of Jesus does not participate in the daily management of the university.

Loyola is not owned by any part of the Loyola Jesuit Community, the Chicago Province of Jesuits, or the Society of Jesus; as to all property used by the university, it is, as a not-for-profit corporation, the owner with power to hold, use, or otherwise deal in, with, or any interest therein, situated in or out of the State of Illinois. The principal source of Loyola's financial support is tuition fees paid by students who, themselves, receive monetary aid from the federal government.

In fiscal years 1978 and 1979, the university received $6,465,891 and $6,980,621, respectively, from various agencies of the United States government. In the same two years, although the amount was the largest single corporate grant to the university, the Loyola Jesuit Community of Chicago contributed between $400,000 to $500,000, sums which were about .3% of Loyola's total annual revenue. This contribution was a return of approximately 25% per cent of salaries which Jesuits received from Loyola in the same years.

Some of these salaries were earned by Jesuits who were faculty members in the Department of Philosophy of the College of Arts and Sciences, one of the largest such departments in this country. In 1978, and until the present, the department had 31 permanent, tenure-track positions. A professor of philosophy could be hired for such a position only when one became vacant, either through retirement or other departure of a tenured professor. Being in a permanent tenured track position means that a faculty member has the potentiality of becoming a tenured permanent professor.

In September 1978, because three Jesuit priests were going to retire from the department, it became known that three tenured positions were going to becomes vacant. Consequently, the prospect of these vacancies became a matter of discussion among members of the faculty; and at a general meeting of the department on October 12, 1978, attended by most of the tenured faculty members, the chairman made a report in which he stated that:

> We anticipate 3 full-time faculty openings in the Philosophy Department beginning September 1979. They are the position of Fr. Dehler and those of Fr. Grant and Fr. Loftus after they retire at the end of the current academic year.
>
> There are two different kinds of departmental needs which seem to bear heavily on the decision as to the kind of persons we should seek to hire for these openings.
>
> 1. The first is a need which the Chairman voiced two years ago just after Fr. Dehler's resignation. That is, the need for an adequate Jesuit presence in the Department. We are a Philosophy Department in a University with a Jesuit tradition. It is mainly by reason of this tradition that philosophy has the importance it does in the education of Loyola undergraduates. Therefore, it behooves us, however strongly we may feel about "the autonomy of philosophy," to acknowledge our association with this tradition. One very basic and obvious way of making such acknowledgement is by insisting upon an adequate Jesuit presence in the faculty of the Department. With the retirement of Father Grant and Father Loftus, we shall be left with 4 out of 31 faculty positions occupied by Jesuits. 4 out of 31 is not an adequate Jesuit presence in the Department. In the judgment of the Chairman, it would be

highly desirable to fill all three openings with professionally competent Jesuit philosophers. And it is his recommendation that we do so if we can.

2. The second kind of departmental need is for faculty especially qualified to teach courses in the following areas: a. Applied ethics, especially medical ethics. There is an increasing student demand for such courses and for additional undergraduate course offerings at the Medical School. b. Philosophy of Law. This is one of the most popular of our 300-level course offerings. It needs to be offered annually both at Lake Shore Campus and Water Tower Campus and there seems to be some desire that we offer it annually in the Law School. c. Logic. There is an exceedingly heavy student enrollment at both Lake Shore Campus and Water Tower Campus. Additional sections of courses in logic should be offered on each campus.

Consequently, we should seek persons who have special competence and interest in teaching courses in these areas. The Chairman's recomendation is that we seek to hire persons who will help teach in these areas.

These two kinds of needs are different though not incompatible. The Chairman's recommendations as to hiring is the following:

That for each of these 3 positions we seek to hire a professionally competent Jesuit philosopher—preferably a young Jesuit with competence to teach in one or several of the areas mentioned above.

The matter remained under general exchange of views among members of the faculty; and at the November 30 general department meeting, the chairman referred to the previous recommendations he made on October 12. Then after some discussion, it was moved and seconded:

That for each of the 3 positions we seek to hire a professionally competent Jesuit philosopher—preferably a young Jesuit with competence to teach in one or several of the following areas: a) applied ethics, especially medical ethics; b) philosophy of law; and c) logic; and that if we should be unable to hire such, we hire temporary full-time person(s) with special competence to teach in one or several of these areas.

The motion was adopted by a vote in which only tenured faculty members were qualified to participate. Eleven were in favor, none against, and one abstained. The plaintiff in this case, Jerrold S. Pime, who is a Jew, was then a part-time teacher in the department.

This fact was known to the chairman of the department because in September 1976 he had recommended that Loyola hire the plaintiff as a part-time lecturer to teach two sections on "the Philosophy of Man." At that time, plaintiff held a *Licence Es Lettres* (Philosophie) which he had earned in 1974, and a *Matrise Es Lettres* (Philosophie) which he had earned in 1975, both at the Universite De Paris IV (Sorbonne). However, because he was a part-time faculty member, his application and qualifications were not reviewed by the Rank and Tenure Committee of the university. He taught several courses until the Fall of 1978; and his work as a teacher received the approval of his students and that of the chairman of the department. In the course of his teaching, he became acquainted with members of the tenured faculty; and as a result, he asked one of them, Dr. H. Seigfried, to observe him in class which Dr. Seigfried did and then made suggestions by which plaintiff could improve his teaching technique. In the summer of 1978, plaintiff was invited to participate in the Second International Lichtenstein Symposium in Vienna, Austria, and later the thesis he had written in 1975 for the *Matrise Es Lettres* was published, in part.

Other than this instance, at the time the three tenured faculty vacancies were being discussed, plaintiff had not published any scholarly work nor had he became known as a scholar in philosophy either within Loyola or outside the university. In January 1979, after the faculty decision, plaintiff in a conversation with the chairman of

the philosophy department told him that he expected to receive his doctorate from The Sorbonne in June 1979. The faculty's decision concerning the anticipated three full-time openings was made known to all who taught in the Department of Philosophy. Copies of the minutes of both the October 12 and November 30, 1978 general department meetings were placed in the plaintiff's mailbox at the school. According to his testimony in this case, upon reading the minutes, he was stunned. He said he had worked hard; he expected to earn his doctorate in June 1979, and he had never received any negative comments about his teaching. Moreover, from the time he became a part-time lecturer, the head of the department had given him more advanced courses to teach; and it hurt him to learn that the possibility of being considered for one of the tenure-track positions was closed to him because he was a Jew. Later, he verified the faculty's decision with Dr. Seigfried who was present at both the October 12 and November 30, 1978 general meetings of the department.

Plaintiff continued in his part-time position; in January 1979, the chairman of the department asked him to teach two philosophy courses, one in ethics and values, one a 300-level in contemporary issues. The plaintiff agreed to do so; he did not complain to any Loyola official concerning the faculty decision to hire three qualified Jesuits to replace the three Jesuit priests who were going to retire.

Sometime during the month of April 1979, plaintiff talked to the chairman of the Department of Philosophy and asked him when there would be a full-time, tenure-track position for him in the department. The chairman, who knew of plaintiff's work and the quality of his teaching, said he saw nothing in the way of a full-time tenure-track position for him in the next three or four years. Plaintiff did not tell the chairman he was interested in, or that he believed he was qualified for, any of the three positions that were to become vacant upon the retiring of the three Jesuit priests.

The faculty decision of November 30, 1971 had stated that

> If we should be unable to hire such [a professionally competent Jesuit philosopher] we [should] hire a temporary full-time person(s) with special competence in one or several of these areas.

Plaintiff did not tell the chairman of the department that he felt he had special competence to teach in one or several of the areas of learning to which the tenured faculty referred when the three positions were reserved for professionally competent Jesuit philosophers. Instead, plaintiff completed teaching the two courses in the spring 1979 semester; and thereafter, without communicating with the chairman of the philosophy department, or with anyone else at Loyola, terminated his relation with the university.

On September 13, 1979, he filed a charge of employment discrimination against Loyola with the Equal Employment Opportunity Commission alleging that

> I had submitted my resume and had inquired about the possibility of securing a full-time position in the philosophy department. In March 1979, Kenneth Thompson, department head, informed me that he did not see any full-time positions opening for the next three (3) to four (4) years. I believe that I have been discriminated against because of my religion. . . .

On April 2, 1980, the Commission issued plaintiff his notice of right to sue; and thereafter, he filed suit in this court claiming he had been the victim of religious discrimination in an employment opportunity.

## II

### A

Loyola's first affirmative defense to this claim is the exemption in § 703(e)(2) of Title VII which states that

> It shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ em-

ployees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society....

Loyola concedes it is an employer under the Act; but it contends that the amount of money which Jesuits donate to the university from their salaries, the number of Jesuits on the Board of Trustees, and the role they play in the administration of the university, establish that Loyola is supported, controlled, and managed by the Society of Jesus, a religious order of the Catholic Church.

■ This court does not agree. In its ordinary sense, the word "whole" which Congress used in this subsection of Title VII means all, total and entirely. *Coon v. Heinzman*, Tex.Civ.App., 281 S.W.2d 461, 464 (1955). As to the phrase "substantial part" in the same subsection, it has been construed as meaning that which is considerable in amount, value, or the like. *Safe Deposit & Trust Co. of Baltimore v. Magruder*, 34 F.Supp. 199, 203 (D.C.Md. 1940). One court has said that while the phrase is not one of mathematical precision, it means the converse of insubstantial or immaterial. *Berry v. 34 Irving Place Corp.*, 52 F.Supp. 875, 879 (D.C.N.Y.1943). Therefore, when a university like Loyola defends an employment discrimination suit on the theory that it is in whole or in substantial part supported, controlled, or managed by a religious society, it must prove that all or a considerable amount of its support, control, or management comes from or is in the hands of the religious society. Loyola has not proved that its relation with the Society of Jesus is of this kind. ·

■ Plaintiff correctly points out that although the university's by-laws require that its president be a Jesuit and one more than one-third of its trustees be Jesuits, neither the president nor any Jesuit board member is instructed or directed by the Society of Jesus with regard to university matters. The president is obliged to execute university policy as set by the Board of Trustees, and he does so; his duties are set forth in the university by-laws as interpreted by the trustees. None of Loyola's administrators, vice presidents and deans who are Jesuits, are controlled or directed by or get any instruction from the Society of Jesus on how to discharge their university duties.

In numbers, at any rate, the impact of the Society of Jesus on Loyola's management and the control of its affairs is certainly insubstantial. For example, only 7 of 100 academic administrators at Loyola were Jesuits in 1980; at the time of the trial in this case, eight to nine per cent of the university's full-time faculty were Jesuits; and as of November 1980, from among 479 full-time and part-time faculty in the College of Arts and Sciences, only 58 were Jesuits. The three-tenths of one per cent (.3%) of Loyola's income that Jesuits contribute annually is not a substantial part of Loyola's financial support; but more important, the annual contribution is in fact a return to Loyola of money originally paid by the university to the Society of Jesus. Thus, in contrast with the college in *E.E. O.C. v. Mississippi College*, 626 F.2d 477 (5th Cir.1980) which proved it was owned and operated by a religious organization, and in contrast with the seminary in *E.E. O.C. v. Southwestern Bap. Theological Seminary*, 651 F.2d 277 (5th Cir.1981)[1] which the evidence established was owned, operated, and controlled by a religious corporation, Loyola in this case has not proved it is in whole or in substantial part, supported, controlled or managed by the Socie-

---

**1.** This court recognizes that construction and application of § 703(e)(2) were not issues either in *Mississippi College* or *Seminary*. But without regard to the particular section of Title VII that was involved, these two cases are ·good illustrations of what are the characteristics of an institution of learning that is owned, operated, supported and controlled by a religious corporation or association.

ty of Jesus. For these reasons, this court concludes that Loyola does not qualify for the exemption in § 703(e)(2) of Title VII; its first affirmative defense, therefore, must fail.

### B

■ Loyola's second affirmative defense is the exemption in § 703(e)(1) of Title VII which states that

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to hire and employ employees ... on the basis of his religion ... in those certain instances where religion ... is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise ....

Loyola contends that under this subsection it is not an unlawful employment practice for it, as an employer, to hire and employ Jesuits for designated faculty positions when that religious persuasion is a *bona fide* occupational qualification reasonably necessary to the normal operation of the university's business or enterprise. It argues that the university holds itself out to the public as a Jesuit and Catholic institution of higher learning; and so, the hiring of the three Jesuit priests in this case, members of an order of the Roman Catholic Church, was reasonably necessary to the operation of the university. Loyola insists that members of the Society of Jesus receive unique training and experience which is reasonably necessary to the normal operation of Loyola as a Jesuit and Catholic university generally, in the offering of curricula and courses in its Department of Philosophy in particular, and for the continuance of what Loyola calls "the Jesuit presence."

This court agrees. Of course, as an employer under the Act, Loyola may not engage in an unlawful employment practice.

The objective of Congress in enacting Title VII was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees, *Griggs v. Duke Power Company*, 401 U.S. 424, 429, 91 S.Ct. 849, 852, 28 L.Ed.2d 158 (1971); and "assure equality of employment opportunities by eliminating those practices and devices that discriminate on the basis of race, color, religion, sex, or national origin," *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 457, 95 S.Ct. 1716, 1719, 44 L.Ed.2d 295 (1975).

But in between the absolute prohibition of § 703(a) and the exemption in § 703(e)(1) there is an area of discretionary prerogatives within which an employer, in good faith, may determine that religion as an occupational qualification is reasonably necessary to the normal operation of his particular business or enterprise. See *Bowe v. Colgate-Palmolive Company*, 272 F.Supp. 332, 360–61 (D.C.Ind.1967), aff'd [rev'd] on other grounds 416 F.2d 711 (where the *bona fide* occupational qualification was sex). The restrictive language of § 703(e)(1), illumined by its relevant legislative history, establishes that the exemption based on *bona fide* occupational qualifications was meant by Congress to be an extremely narrow exception to the general prohibition of employment discrimination on the basis of religion, sex, or national origin. See *Dothard v. Rawlinson*, 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977) (where, again, the basis of the claimed occupational qualification was sex).[2]

Focusing on this point, plaintiff argues that a *bona fide* occupational qualification is available as an exception to Title VII liability only when the sole purpose is the promotion of religion, or the position to be

---

**2.** It appears, from a careful survey of the decided cases, that the most common basis for the claim of a *bona fide* occupational qualification is sex. See, e.g., *Wilson v. Southwest Airlines Co.*, 517 F.Supp. 292 (N.D.Tex.1981). In the scholarly literature, there is a paucity of study and comment of religion as a *bona fide* occupational qualification in the context in which the subject arises in this case. See, e.g., Boothby & Nixon, *Religious Accommodation: An Often Difficult Task*, 57 Notre Dame Lawyer 797 (1982).

filled is one that is limited to the performance of religious functions. In support of this argument, he cites *McClure v. Salvation Army*, 323 F.Supp. 1100, aff'd 460 F.2d 553 (5th Cir.1972). But plainly, plaintiff is mistaken in his understanding of the exemption; he is also mistaken in his reliance on the cited case.

In *McClure*, as a cursory reading discloses, the district court found, a finding affirmed by the court of appeals, that under the 1964 version of § 702 in Title VII, the Salvation Army was a religion; and that the activities performed for it by the plaintiff, a woman-commissioned officer and one of its ordained ministers was religious in nature, that of a minister. Therefore, the court concluded that Congress, through the non-specific provisions in the Civil Rights Act relating to equal employment opportunities, did not intend to regulate the employment relation between a church and its minister.

In this case, Loyola does not claim it is a religion; nor does it claim that the three Jesuit priests it hired were ministers. What Loyola claims is that under § 703(e)(1), any employer, it being one, can hire an employee on the basis of religion in those certain instances where religion is a *bona fide* occupational qualification reasonably necessary to the normal operation of the particular business or enterprise. This exemption is not like the provision in § 702 of Title VII where an employer who seeks its protection must be a religious corporation, association, educational institution, or society. See *Feldstein v. Christian Science Monitor*, 555 F.Supp. 974, 978 (D.Mass.1983) (news publication, a religious activity of a religious organization, may apply test of religious affiliation to a candidate for employment). The exemption Loyola invokes in this case, as the language of the subsection reveals, is not restricted to those purposes that promote religion, or to those positions to be filled solely for the performance of religious functions.

For example, in *Kern v. Dynalectron Corp.*, 577 F.Supp. 1196 (N.D.Tex.1983), a pilot was employed to fly helicopters over crowds of Moslems making their pilgrimage along Muhammad's path to Mecca in Saudi Arabia. Under the laws of that country, based on the tenets of Islamic religion, non-Moslems are prohibited from entering the holy area, Mecca, under penalty of death. Because of this, the employer required that all pilots stationed in Jeddah, where the helicopter flights were to begin, be (or become) Moslem. Had the pilot continued to work for his employer, he would have had to enter the holy area of Mecca; therefore, his conversion from Baptist to Moslem was required.

Accordingly, the pilot agreed to become a Moslem, took an orientation course taught in Tokyo, Japan, chose his new Islamic name, signed his certificate of conversion, but changed his mind about it. At that point, he returned to Ft. Worth, Texas, at his own expense and told his employer of his decision. Later, because of a disagreement about a new position, the pilot left his job and filed a complaint with the EEOC alleging he was denied an employment opportunity because of his religious beliefs. The court held that, under these circumstances, requiring a helicopter pilot to be a Moslem was a *bona fide* occupational qualification within the meaning of § 703(e)(1). 577 F.Supp. at 1203.

In a more recent case, *Abrams v. Baylor College of Medicine*, 581 F.Supp. 1570 (S.D. Tex.1984), the issue was whether the exclusion of Jews from cardiovascular surgical teams that were sent to the King Faisal Specialist Hospital and Research Center, Riyadh, Saudi Arabia, was a *bona fide* occupational qualification under § 703(e)(1). The court held that under the circumstances of that case, it was not. 581 F.Supp. 1570. Implicit in the court's conclusions of law is the suggestion that had the evidence been different, the ruling would have been otherwise.

These cases, and the language of the statute, teach us that the test for application of the exemption in § 703(e)(1) is (1) hiring of an employee on the basis of religion, sex, or national origin; (2) religion, sex, or national origin is a *bona fide* occu-

pational qualification; and (3) the occupational qualification being reasonably necessary to the normal operation of the employer's business or enterprise. In this court's judgment, Loyola met this test when its tenured faculty approved the recommendations of the chairman of the Department of Philosophy and reserved the three anticipated vacancies for competent Jesuit philosophers.

Clearly, religion, the fact that the three full-time vacancies were reserved for Jesuits, persons who were Catholics, was the basis for the decision which the tenured faculty made on October 12, 1978, at the general meeting of the Department of Philosophy. In good faith, Loyola, through its tenured faculty in the Department of Philosophy, decided that being a Jesuit, again a matter of religion, was to be required of those who were to fill the three vacancies. This was a *bona fide* determination of qualification for the positions. Finally, the full-time faculty determined that it was necessary for the future of the department, and for Loyola, that "a Jesuit presence" in the university be maintained, and that the designated areas of teaching be done by competent Jesuit philosophers. Therefore, Loyola qualifies for the exemption in 703(e)(1) of Title VII; and it must prevail on its second affirmative defense to plaintiff's claim.

### III

Accordingly, the court finds in favor of defendant Loyola University against the plaintiff Jerrold S. Pime, and gives judgment to defendant, plaintiff to take nothing by his complaint. The Clerk is directed to enter a judgment in conformance with Rule 58, Fed.R.Civ.P.

So ordered.